JOHNSON, APPELLANT, *v.* UNIVERSITY HOSPITALS OF CLEVELAND
ET AL., APPELLEES.

[Cite as Johnson *v.* University Hospitals of Cleveland
(1989), 44 Ohio St. 3d 49.]

(No. 88-485—Submitted March 28, 1989—Decided July 5, 1989.)

*Law Offices of James E. Behrens,* James E. Behrens and *Joseph R. Gioffre,* for appellant.

*Arter & Hadden, Robert C. Tucker* and *Irene C. Keyse-Walker,* for appellees.

*Patrick J. Perotti,* urging affirmance for *amicus curiae* Ohio Right to Life Society, Inc.

DOUGLAS, J. The issue raised in this case is whether the parent of a healthy, normal child, born subsequent to a negligently performed sterilization operation, may recover, as an element of damages, the expenses of raising the child.

Numerous cases in other jurisdictions have been reported concerning the type of action before us. These cases have been variously classified as "wrongful pregnancy," "wrongful birth," or "wrongful life." However, a consensus appears to be emerging that several distinct causes of action are described in these categories. *Smith* v. *Gore* (Tenn. 1987), 728 S.W. 2d 738, 741.

I

An action for "wrongful pregnancy" refers to a suit filed by a parent for proximate damages arising from the birth of a child subsequent to a doctor's failure to properly perform a sterilization procedure. See, *e.g., Jones* v. *Malinowski* (1984), 299 Md. 257, 473 A. 2d 429. The case before us now is a "wrongful pregnancy" action.

"Wrongful birth," on the other hand, refers to a cause of action whereby parents, on their own behalf, seek to recover damages for the birth of an impaired child when the impairment was caused by the defendant's failure to diagnose or discover a genetic defect in the parents or the infant through prenatal testing or counseling in time for the parent to obtain a eugenic abortion or to prevent pregnancy altogether. See *Smith* v. *Gore, supra,* at 741.

A "wrongful life" action is brought by a child, on his own behalf, claiming damages due to the negligent failure of physicians to sterilize his parents. *Bowman* v. *Davis* (1976), 48 Ohio St. 2d 41, 45, 2 O.O. 3d 133, 135, 356 N.E. 2d 496, 499, fn. 3.

This court in *Bowman,* a five-to-two *per curiam* decision, clearly decided that Ohio recognizes a "wrongful pregnancy" action. Such a cause is "* * * not barred by notions of public policy. The choice not to procreate, as part of one's right to privacy, has become (subject to certain limitations) a Constitutional guarantee." (Citations omitted.) *Bowman* at 46, 2 O.O. 3d at 135, 356 N.E. 2d at 499.

*Bowman* did not directly address

the measure of damages in a "wrongful pregnancy" action. The court said at 44, 2 O.O. 3d at 134, 356 N.E. 2d at 498, fn. 1:

"A third issue, that appellees' damages should be limited to the expenses of the *pregnancy* after a negligently performed sterilization, was not raised at the appellate level. To the extent that this issue is not settled in our discussion of appellant's other propositions of law, we decline to decide it. * * *" (Citations omitted.) (Emphasis *sic.*)

Thus, whether child-rearing expenses are recoverable in a "wrongful pregnancy" action in Ohio is a question of first impression. Numerous jurisdictions have already addressed this issue and four theories of recovery of damages in a "wrongful pregnancy" action have developed. We will review these four theories.

## II

### A

### No Recovery

When cases of this kind were first brought in the United States, courts were hesitant to recognize any cause of action at all. An early case, *Christensen* v. *Thornby* (1934), 192 Minn. 123, 255 N.W. 620, involved a failed vasectomy. The Minnesota Supreme Court denied any recovery in that case. Subsequently, in *Shaheen* v. *Knight* (1957), 11 Pa. D. & C. 2d 41, a Pennsylvania common pleas court held that to permit damages for the birth of a healthy child was foreign to the

popular sentiment regarding children and the family. Both of these jurisdictions now recognize an action for "wrongful pregnancy."[2]

Recently, at least one other court has taken the position that the birth of a normal child is "* * * an event which, of itself, is not a legally compensable injurious consequence even if the birth is partially attributable to the negligent conduct of someone purporting to be able to prevent the eventuality of childbirth." *Szekeres* v. *Robinson* (Nev. 1986), 715 P. 2d 1076, 1078. Although apparently refusing to recognize the tort of wrongful pregnancy, the court permitted the case to go to trial on the theory of breach of contract. Thus, Nevada is currently the only jurisdiction to adhere to this absolute position of no tort recovery in a "wrongful pregnancy" action, at least when a normal, healthy child is born.

### B

### The Benefits Rule

Several jurisdictions recognize that an uninterrupted chain of causation exists between a negligently performed sterilization procedure and the foreseeable consequences of the conception, pregnancy and birth of a normal child. *C.S.* v. *Nielson* (Utah 1988), 767 P. 2d 504, 510-511, citing *Smith* v. *Gore, supra,* at 743.

Thus, these courts believe that "* * * it must be recognized that * * * [rearing] costs are a direct financial injury to the parents, no different in immediate effect than the medical ex-

---

[2] Subsequently, Pennsylvania adopted the limited damages rule in *Mason* v. *Western Pennsylvania Hosp.* (1982), 499 Pa. 484, 453 A. 2d 974. Minnesota adopted the benefits rule in *Sherlock* v. *Stillwater Clinic* (Minn. 1977), 260 N.W. 2d 169. However, in a "wrongful birth" case, *Hickman* v. *Group Health Plan, Inc.* (Minn. 1986), 396 N.W. 2d 10, 14, fn. 5, the court stated in hindsight that, based on the legislative intent embodied in Minn. Stat. Section 145.424, enacted in the interim, "* * * our reasoning in *Sherlock* may, perhaps, have been erroneous." Thus, Minnesota's law appears unsettled on this issue.

penses resulting from the wrongful conception and birth of the child. Although public sentiment may recognize that to the vast majority of parents the long-term and enduring benefits of parenthood outweigh the economic costs of rearing a healthy child, it would seem myopic to declare today that those benefits exceed the costs as a matter of law. * * *" *Sherlock* v. *Stillwater Clinic* (Minn. 1977), 260 N.W. 2d 169, 175.

·Attempting to balance the policy of compensation for the individual tort victim with the broader social values attached to the place of the family in American society, a number of courts have adopted what has become known as the benefits rule. The rule is derived from 4 Restatement of the Law 2d, Torts (1979) 509, Section 920:

"When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."

In *Jones* v. *Malinowski, supra,* the Court of Appeals of Maryland followed the benefits rule. The court found that traditional tort principles were applicable to a wrongful pregnancy action, and that "* * * the injury to the parents of a normal child does not reside in the product of the negligent act, *i.e.,* the child itself * * *. The parents seek damages, not because they do not love and want to keep the unplanned child, but because the direct, foreseeable and natural consequences of the physician's negligence has [sic] forced upon them burdens

which they sought and had a right to avoid by submitting to sterilization. * * *" *Id.* at 270, 473 A. 2d at 435-436.

In *Jones,* the court permitted the jury to calculate the economic cost of child rearing by weighing the expense against the worth of the child's companionship, comfort and aid to the parents. The court stated that the calculations of the cost of child rearing are based on well-recognized economic factors regularly made by estate planners and insurance companies and are fully appreciated by the average citizen's own family experience. *Id.* at 272, 473 A. 2d at 436. The jury was to assess the benefits of family life, taking into account such factors as the family size, the parents' income, the age of the parents, and the motivating factor for sterilization and then offset these intangible benefits against the economic cost of child rearing. *Id.* at 272, 473 A. 2d at 436-437. See, also, *Ochs* v. *Borrelli* (1982), 187 Conn. 253, 445 A. 2d 883.

However, this approach has been criticized as essentially comparing apples to oranges because it requires the jury to compare pecuniary costs with non-pecuniary benefits and then offset the economic costs of child rearing with these intangible benefits.[3]

Additionally, the benefits rule fails to literally comply with the Restatement's benefits rule, which pertains only when the harm and benefit occur to the *same interest.*· "Damages resulting from an invasion of one interest are not diminished by showing that another interest has been benefited. * * * Damages to a husband for loss of consortium are not diminished by the fact that the husband is no longer under the expense of support-

[3] At least one court has suggested that such intangible benefits may be discounted by intangible costs, *i.e.,* the frustrations and disappointments of child rearing. See

*Univ. of Arizona Health Sciences Center* v. *Superior Court* (1983), 136 Ariz. 579, 584-586, 667 P. 2d 1294, 1299-1301.

ing the wife." 4 Restatement of the Law 2d, Torts (1979) 510, Section 920, Comment *b*. In a wrongful pregnancy case, the central damage alleged is to the plaintiff's financial interest in limiting family size, while the benefits resulting from the birth of the child are basically non-financial in nature.

Another criticism of the tort benefits rule is that it "* * * smacks of condemnation law, where the trier of fact determines the value of the land taken by the condemnor. The trier of fact then determines the benefit that results to the land owner, which benefit is deducted from the original value to determine the proper award. If the concept of benefit or offset were applied to * * * actions [for wrongful pregnancy], we can conceive of the ridiculous result that benefits could be greater than damages, in which event someone could argue that the parents would owe something to the tortfeasors. We think that a child should not be viewed as a piece of property, with fact finders first assessing the expense and damage incurred because of a child's life, then deducting the value of that child's life. * * *" *Beardsley* v. *Wierdsma* (Wyo. 1982), 650 P. 2d 288, 293.

We conclude this section with a detailed explanation of the benefits rule found in *Univ. of Arizona Health Sciences Center* v. *Superior Court* (1983), 136 Ariz. 579, 667 P. 2d 1294:

"In most cases we could join in the 'universally shared emotion and sentiment' expressed by the * * * [rule denying recovery of child-rearing costs], but we do not believe we hold office to impose our views of morality by deciding cases on the basis of personal emotion and sentiment, though we realize we cannot and should not escape the effect of human characteristics shared by all mankind. However, we believe our function is to leave the emotion and sentiment to others and attempt to examine the problem with logic and by application of the relevant principles of law. In this case, we believe that the strict rule [denying recovery of child-rearing costs] is based upon an emotional premise and ignores logical considerations. While we recognize that in most cases a family can and will adjust to the birth of the child, even though they had not desired to have it, we must recognize also that there are cases where the birth of an unplanned child can cause serious emotional or economic problems to the parents. * * *

"* * *

"In our view, the preferable rule is that followed by the courts which, although permitting the trier of fact to consider both pecuniary and non-pecuniary elements of damage which pertain to the rearing and education of the child, also require it to consider the question of offsetting the pecuniary and non-pecuniary benefits which the parents will receive from the parental relationship with the child. Some may fear that adoption of such a rule will permit juries to recognize elements of damage which, because of our private philosophy or views of ethics, we, as judges, believe should not be recognized. We feel, however, that the consensus of a cross-section of the community on such important issues is better and more accurately obtained from the verdict of a jury than from the decision of any particular group of that community. A jury verdict based on knowledge of all relevant circumstances is a better reflection of whether real damage exists in each case than can be obtained from use of any abstract, iron-clad rule which some courts would adopt and apply regardless of the circumstances of the particular case.

"There may be those who fear that the rule which we adopt will permit the award of damages where no real injury

exists. We feel this danger is minimized by giving weight and consideration in each case to the plaintiffs' reasons for submitting to sterilization procedures. Such evidence is perhaps the most relevant information on the question of whether the subsequent birth of a child actually constitutes damage to the parents. * * *

"It may be argued also that the rule which we adopt will have the unhappy effect of creating situations in which parents will testify to their feeling or opinion that the child is 'not worth' the burden of having and rearing. Such testimony could be harmful if or when the child learns of it. 'We are not convinced that the effect on the child will be significantly detrimental in every case, or even in most cases; * * * we think the parents, not the courts, are. the ones who must weigh the risk.' * * *

"* * *

"In reaching our decision, we are influenced greatly by what we perceive to be the uniform rules of damages for all tort cases. One of the basic principles of damage law is the concept that a wrongdoer may be held liable for all damages which he may have caused and all costs which the victim may sustain as a result of the wrong. * * *

"We see no reason why ordinary damage rules, applicable to all other tort cases, should not be applicable to this situation. * * *" (Footnotes and citations omitted.) *Univ. of Arizona, supra,* at 583-586, 667 P. 2d at 1298-1301.

## C
### Limited Damages

The vast majority of jurisdictions which have decided the issue adheres to this theory of damages which denies all *child-rearing expenses.* Refusal to permit recovery has been based upon various considerations:

1. A parent cannot be said to have been damaged by the birth of a normal, healthy child because the benefits of having a child outweigh any economic loss which the parents might incur in rearing and educating a healthy child. *Public Health Trust* v. *Brown* (Fla. 1980), 388 So. 2d 1084, petition for review denied (Fla. 1981), 399 So. 2d 1140.

"[T]he satisfaction, joy and companionship which normal parents have in rearing a child make such economic loss worthwhile. These intangible benefits, while impossible to value in dollars and cents are undoubtedly the things that make life worthwhile. Who can place a price tag on a child's smile or the parental pride in a child's achievement? * * * Rather than attempt to value these intangible benefits, our courts have simply determined that public sentiment recognizes that these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child. * * *" *Terrell* v. *Garcia* (Tex. App. 1973), 496 S.W. 2d 124, 128, certiorari denied (1974), 415 U.S. 927.

2. Child-rearing expenses will be a windfall to the parents, wholly disproportionate to the doctor's culpability.

In *McKernan* v. *Aasheim* (1984), 102 Wash. 2d 411, 415-416, 687 P. 2d 850, 853, a wrongful pregnancy case (which, unfortunately, includes other than wrongful pregnancy language), quoting *Rieck* v. *Medical Protective Co.* (1974), 64 Wis. 2d 514, 518-519, 219 N.W. 2d 242, 244, the court said:

" 'To permit the parents to keep their child and shift the entire cost of its upbringing to a physician who failed to determine or inform them of the fact of the pregnancy would be to create a new category of surrogate parent. Every child's smile, every bond of love and affection, every reason for parental pride in a child's achievements, every contribution by the child to the

welfare and well-being of the family and parents, is to remain with the mother and father. For the most part, these are intangible benefits, but they are nonetheless real. On the other hand, every financial cost or detriment— what the complaint terms 'hard money damages'—including the cost of food, clothing and education, would be shifted to the physician who allegedly failed to timely diagnose the fact of pregnancy. We hold that such result would be wholly out of proportion to the culpability involved, and that the allowance of recovery would place too unreasonable a burden upon physicians, under the facts and circumstances here alleged.' "

. 3. Another rationale is that the cost of child-rearing would be too speculative to measure with any certainty.

"* * * [I]t seems to us that that kind of judgment [recovery for child-rearing costs], if appropriate at all in an American Court of law, might be applied at the end of a life, after it has been lived and when the facts can be identified. But, in our view, any attempt to apply it at birth can only be an exercise in prophecy, an undertaking not within the speciality of our fact-finders." *Coleman* v. *Garrison* (Del. 1975), 349 A. 2d 8, 12.

4. Recovery should be denied to protect the mental and emotional health of the child, sometimes harshly described as an "emotional bastard."

Courts are concerned that if they grant child-rearing costs to the parents in a "wrongful pregnancy" case, that one day the child will learn that he or she was not only unwanted by his or her parents, but was reared by funds supplied by another person, and that this will greatly upset the child. *Byrd* v. *Wesley Medical Ctr.* (1985), 237 Kan. 215, 221-222, 699 P. 2d 459, 466-467.

5. Damages for a "wrongful pregnancy" action should not include child-rearing costs since to allow damages would be the equivalent of allowing damages in an action for "wrongful life."

The appellees argue that this court should follow the reasoning in *Jackson* v. *Bumgardner* (1986), 318 N.C. 172, 181-182, 347 S.E. 2d 743, 748-749. In *Jackson,* the court did not allow damages for the cost of rearing the child because it found, in essence, that such damages would convert an action for "wrongful pregnancy" to an action for "wrongful life," which that court had previously found was not a cognizable injury.

Nevertheless, this court in *Bowman, supra,* specifically disapproved of categorizing a "wrongful pregnancy" action as a "wrongful life" action. Thus, we decline to follow *Jackson's* reasoning.

### D
### Full Recovery

This rule has little, if any, support. However, at least one court considers *Custodio* v. *Bauer* (1967), 251 Cal. App. 2d 303, 59 Cal. Rptr. 463, to be a full recovery case. See *Smith* v. *Gore, supra,* at 742. A California appellate court in *Custodio,* applying general tort principles, found that a child is a foreseeable consequence of a failed sterilization procedure and stated that if a "change in the family status can be measured economically it should be as compensable as the * * * [other] losses." *Custodio, supra,* at 323-324, 59 Cal. Rptr. at 476.[4]

---

[4] The law in California on this issue, however, appears to be unsettled. A subsequent California appellate case, *Stills* v. *Gratton* (1976), 55 Cal. App. 3d 698, 127 Cal. Rptr. 652, while recognizing the rule in *Custodio,* adopted the benefits rule.

Several courts contend that *Bowman* adhered to the rule allowing a full recovery of damages.[5] However, as we stated previously, *Bowman* did not address the measure of damages recoverable in a "wrongful pregnancy" case.

Appellant argues that she is entitled to a full recovery because all the expenses for child support are foreseeable and proximately caused by the negligent sterilization.

Proximate causation involves several factors in addition to the cause-and-effect logic of scientific inquiry:

" 'Proximate cause'—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

"This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands * * *." (Footnote omitted.) Prosser & Keeton, Law of Torts (5 Ed. 1984) 264, Section 41.

### III

In regard to the extent of damages, a number of courts have discussed the reasonableness of the alternatives to rearing a child, *i.e.,* an abortion or adoption, as part of the duty to mitigate.

Appellees have contended that if this court adopts the tort benefits rule, parents would have to mitigate their damages for child rearing by adoption or abortion. Appellees further argue that if the parents choose neither to abort nor adopt and instead keep the child, the jury would have to take this lack of mitigation into consideration when calculating child-rearing expenses.

According to 4 Restatement of the Law 2d, Torts (1979) 500, Section 918(1)[6]:

"* * * [O]ne injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of *reasonable effort* or expenditure after the commission of the tort." (Emphasis added.)

We refuse to say as a matter of law that every parent must mitigate damages by abortion or adoption as a "rea-

---

[5] See *Smith* v. *Gore* (Tenn. 1987), 728 S.W. 2d 738, 742-743; *Fulton-DeKalb Hosp. Auth.* v. *Graves* (1984), 252 Ga. 441, 444, 314 S.E. 2d 653, 655. However, other courts have recognized that in *Bowman,* we expressly declined to rule on the issue of whether damages should be limited to the pregnancy because the issue was not before the court. *E.g., Miller* v. *Johnson* (1986), 231 Va. 177, 186, 343 S.E. 2d 301, 306, fn. 2; *Byrd* v. *Wesley Medical Ctr.* (1985), 237 Kan. 215, 218, 699 P. 2d 459, 462.

[6] 4 Restatement of the Law 2d, Torts (1979) 500, Section 918, is designated "Avoidable Consequences."

sonable effort" to avoid child-rearing expenses. In fact, we find either suggestion repugnant. Many people would be opposed to either recourse. Thus, in a "wrongful pregnancy" action, the mother need not mitigate damages by abortion or adoption since a tort victim has no duty to make *unreasonable* efforts to diminish or avoid prospective damages.

## IV

We come now to decide which course of action is best for Ohio. In doing so, we comment that this has been one of the most difficult cases we have been called upon to decide. Our occupational duty continuously requires us to balance rights and responsibilities of persons regardless of their color, sex, position or station in life. We accomplish that balancing in this case while recognizing that our decision will be something less than universally accepted.

We reject the "no recovery" rule as being one that is clearly in conflict with the traditional concepts of tort law. Certainly, in the case now before us, there was a duty and a breach of that duty which was the proximate cause of damage. What damages should be allowed is the more difficult question.

Likewise, we are opposed to following the benefits rule because of the impossibility of a jury placing a price tag on a child's benefits to her parents. We are not in the business of placing a value on a smile or quantifying the negative impact of a temper tantrum. We are not qualified to judge whether a child might become President or a hopeless derelict. We cannot pretend to know what the future may hold—and neither can or may a jury!

Furthermore, we are not persuaded to adopt the full recovery rule because the strict rules of tort should not be applied to an action to which they are not suited, such as a wrongful pregnancy case, in which a doctor's tortious conduct permits to occur the birth of a child rather than the causing of an injury.

After reviewing the four theories of recovery, we find the limited damages theory is the most persuasive rule. In Ohio, a tort recovery may not be had for damages which are speculative. See *Day* v. *Gulley* (1963), 175 Ohio St. 83, 23 O.O. 2d 382, 191 N.E. 2d 732. Allowing a jury to award child-rearing costs would be to invite unduly speculative and ethically questionable assessments of such matters as the emotional effect of a birth on siblings as well as parents, and the emotional as well as the pecuniary costs of raising an unplanned and, perhaps, unwanted child in varying family environments.

Additionally, these speculative expenses for child rearing in a "wrongful pregnancy" action were not recognized at common law, just as damages were not recognized in an action for "wrongful death." We believe that if such expenses are to be recognized, it is the role of the General Assembly to establish guidelines in a "wrongful pregnancy" action as the legislature has done in allowing damages in "wrongful death" actions.[7]

Thus, in a "wrongful pregnancy" action, Ohio recognizes the "limited damages" rule which limits the damages to the pregnancy itself[8] and does not include child-rearing expenses. The extent of recoverable damages is limited by Ohio's public policy that the

---

[7] In Ohio, the action for wrongful death was created by statute in 1851 and now appears at R.C. Chapter 2125. See 2 Revised Statutes of Ohio (1860) 1139-1140.

[8] These damages may include, but are not limited to, medical expenses and loss of consortium during the pregnancy and birth, emotional distress during that time, the

birth of a normal, healthy child cannot be an injury to her parents.

We are aware of the possible hardships that might result from today's decision and we are not blind to the economic realities that accompany the rearing of a child. However, if liability is to be extended in such cases to child-rearing expenses, then the General Assembly is the proper forum in which the competing social philosophies involved in "wrongful pregnancy" actions should be considered in establishing the law.

Accordingly, based on the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, WRIGHT and RESNICK, JJ., concur.

H. BROWN, J., dissents.

H. BROWN, J., dissenting. The decision not to have children or to limit the size of a family is the lawful prerogative of any couple and of any mother. Our charge is not to weigh the moral values in making that choice. It is not for us to decide whether a couple errs when they elect to have no children. It is not for us to say whether a couple with three children makes a wise choice when they decide to have no more children in order to concentrate their resources on adequate support for the existing children.

The decision reached by the majority today penalizes the mother (or the couple) who makes these lawful choices. The penalty it extracts is to deny a recovery for damages caused by the negligence of another. This denial violates principles which are well-established in the law of negligence.

Recovery for negligence is grounded upon four elements: (1) a duty by the defendant to the plaintiff, (2) a breach of that duty (failure to act with due care), (3) a proximate cause relationship between the breach of duty and the resulting damages, and (4) provable damages.

Where a doctor undertakes to perform a tubal ligation for a woman to prevent the conception of children, a duty arises between the doctor and his patient. If the doctor performs this procedure negligently, there is a breach. The proximate result of the breach is the birth of a child. The cost of rearing a child can be measured. It is far less speculative than many, if not most, types of damage which are recoverable in a civil action. Pain and suffering, damage for the injury itself (*i.e.*, loss of an arm), loss of consortium, loss of earning potential, and even future medical expenses, are all more speculative to gauge than is the cost of rearing a child. Studies and statistics abound to help measure the cost of rearing a child. The costs of child rearing are routinely computed in insurance and estate planning. *Jones* v. *Malinowski* (1984), 299 Md. 257, 272, 473 A. 2d 429, 436. Juries frequently calculate such costs in personal injury and wrongful death cases.

The position taken by the majority does not challenge the above reasoning. Instead, the majority chooses to deny recovery to one group of plaintiffs (and grant immunity to one group of tortfeasors) on the ground of public policy.

The application of public policy as a rationale to determine tort recovery is not warranted in this case. As previously noted, the choice of the mother (or couple) is a lawful one. This court should not treat that choice as unlaw-

---

mother's lost wages during a reasonable length of time, and the mother's pain and

suffering during the pregnancy and childbirth.

ful by imposing a denial of rights to those who make it. Further, the public policy of Ohio which underlies the majority position is inconsistent with the public policy as set forth in *Bowman* v. *Davis* (1976), 48 Ohio St. 2d 41, 45-46, 2 O.O. 3d 133, 135-136, 356 N.E. 2d 496, 499:

"* * * [W]e must further determine *whether an action following a negligently performed and 'unsuccessful sterilization procedure' is against public policy.*

"It is the opinion of this court that the cause of action pursued successfully by the Bowmans at the trial and appellate levels *is not barred by notions of public policy.* The choice not to procreate, as part of one's right to privacy, has become (subject to certain limitations) a Constitutional guarantee. See *Griswold* v. *Connecticut* (1965), 381 U.S. 479; *Roe* v. *Wade* (1973), 410 U.S. 113; and *Doe* v. *Bolton* (1973), 410 U.S. 179. *For this court to endorse a policy that makes physicians liable for the foreseeable consequences of all negligently performed operations except those involving sterilization would constitute an impermissible infringement of a fundamental right.*" (Emphasis added in part.)

Although *Bowman* did not specifically decide the proper standard for the measuring of damages for negligent sterilization cases (because the issue was not raised at the appellate level), it found that public policy did not preclude a sterilization case from being treated like other tort cases.

There is a still greater error underlying the public policy assumption on which the majority's decision rests. Our decision need *not* wrestle with the worth of human life, or "placing a value on a smile or quantifying the negative impact of a temper tantrum," as the majority so poignantly puts the issue.

This case is *not* about whether Ruth Johnson wants to keep her child. Johnson does not want to give up her baby girl. Now that the child is born she will do her best, within her resources, to raise and love the child. The mother has accepted the inevitable, and loves and wishes to raise her child. This does not erase the fact of injury and resulting damages. As one court has observed:

"* * * [T]he injury to the parents of a normal child does not reside in the product of the negligent act, *i.e.,* the child itself; damages are not sought on the child's behalf in such cases. Nor do the claimed damages have any relation to the child's value or worth vis-a-vis the expenditures necessary to raise her. *The parents seek damages,* not because they do not love and want to keep the unplanned child, but *because the direct, foreseeable and natural consequences of the physician's negligence has [sic] forced upon them burdens which they sought and had a right to avoid by submitting to sterilization.*" (Emphasis added.) *Jones, supra,* at 270, 473 A. 2d at 435-436.

To properly analyze this case, it is necessary to go back in time to the point where Ruth Johnson made her lawful choice not to have a child. That choice was thwarted by the negligence of the defendant. The consequence is measurable and Johnson should recover the damages caused by the frustration of her choice.

To inject the unmeasurable value of a human life (the baby) into the argument is to charge the issues with misdirected emotions. In a wrongful death case we do not allow recovery for the value of the life that has been lost. We do not value lost smiles. We do not allow such recovery for the good reason that it cannot be measured. By the same logic we should not deprive a plaintiff of measurable damages flowing from a tort because smiles and temper tantrums cannot be valued.

The inconsistency in the majority's application of tort law to this case is demonstrated by the majority's willingness to recognize damages for "the pregnancy itself." There is no rational difference between the damages caused by "the [wrongful] pregnancy itself" and the child-rearing expenses. The cost of the pregnancy can no more be balanced against "the value * * * [of] a smile" than can the child-rearing expenses.[9]

The majority expresses concern that a child may experience emotional harm by discovering that the parents did not desire the child's conception. Such concern is disingenuous. The child may draw the same conclusion from the fact that a suit has been filed to recover the expenses of pregnancy and childbirth. Surely the majority cannot believe that refusal to recognize child-rearing expenses as damages will result in Johnson's child being raised in a more loving, nurturing environment.

This court should follow well-established principles of tort law and allow the plaintiff to recover the readily measurable damages which were proximately caused by the defendants' negligence. Accordingly, I dissent.

---

[9] I agree with Judge Markus' dissent in the case below in making the point that we should not distinguish between "healthy" and "abnormal" children born as a result of negligent medical treatment. The only difference should be one of assessing the amount of damages, not one of whether damages should be awarded.