COLEMAN et al., Appellants,

v.

DOGRA et al., Appellees.

[Cite as *Coleman v. Dogra,* 157 Ohio App.3d 530, 2004-Ohio-3109.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 83522.

Decided June 17, 2004.

Garson & Associates, Christian R. Patno and Roger M. Bundy, for appellants (Lois Marie Coleman, Individually and as Administrator of the Estate of San'Tara Coleman).

Reminger & Reminger, William A. Meadows and Brian D. Sullivan, for appellee (Vikram Dogra, M.D.).

Davis & Young, Jan L. Roller, Richard M. Garner, for appellees (University Hospitals/Cleveland, Women's Health Center, Debra Hanson, CNM, Sharon Kerwin, CNM, and Ann Raffis, CNP).

COLLEEN CONWAY COONEY, Judge.

{¶ 1} Plaintiff-appellant, Lois Marie Coleman ("Coleman"), appeals from the trial court's granting of summary judgment in favor of defendants-appellees, Vikram Dogra, M.D. ("Dr. Dogra"), University Hospitals of Cleveland/Women's Health Center ("UH"), Debra Hanson, CNM ("Hanson"), Sharon Kerwin, CNM ("Kerwin"), and Ann Raffis, CNP ("Raffis") (collectively referred to as "appellees"). We affirm in part, reverse in part, and remand to determine Coleman's individual claim.

{¶ 2} In July 2001, one of Coleman's midwives ordered a basic ultrasound to assess the progress and development of Coleman's unborn child approximately four months into her pregnancy. Dixie, the technician who conducted the ultrasound at UH, pointed out the baby's spine, feet, and heart to Coleman and informed her that the baby was a girl. However, Dixie had difficulty "find[ing] the things she was looking for." She asked Coleman to empty her bladder to relieve pressure so she could evaluate the baby's head. Even after Coleman complied, Dixie had difficulty finding the baby's skull. She sought assistance from another technician, who changed the transducer on the ultrasound machine to provide deeper penetration. Coleman stated in her deposition that after the change in equipment, the technician told her that everything looked "fine" and that she had a healthy baby.

{¶ 3} Dr. Dogra stated that Dixie called him after the exam and told him that the organs were suboptimally visualized, which meant that the organs were not clearly visible. Raffis also testified that when there is difficulty or inability in visualizing, the patient is usually sent to McDonald Women's Hospital, which handles patients requiring more invasive ultrasounds. However, Coleman was never referred to McDonald after her ultrasound was deemed technically difficult and the images of the baby's head, brain, and face were suboptimally visualized.

{¶ 4} Dr. Dogra admitted that the only conversation he had with Dixie was that the ultrasound was technically difficult. Dixie did not inform him of the steps taken to obtain clearer views or of the need for assistance by another technician. Dr. Dogra reviewed and interpreted the ultrasound and prepared his report. Of the 38 ultrasound views taken, approximately seven were suboptimally visualized and included the heart, head, brain, and face. However, the report indicated no gross abnormalities except for structures not visualized optimally.

{¶ 5} Dr. Dogra testified in his deposition that it was his responsibility to make sure that the technician does a sufficient job to provide him with the information needed to do an adequate "read," but that it was up to the physician who ordered the ultrasound to send the patient for an upper level ultrasound. He preferred that the primary care physician communicate the results of the ultrasound to the

patient. However, he did not have any verbal communication regarding his findings with the person who ordered Coleman's ultrasound.

{¶ 6} According to Raffis and Hanson, the ultrasound report did not mention routinely reported areas of the brain. Hanson stated that the report was somewhat ambiguous because it indicated that the baby's head showed no evidence of abnormality but also indicated that some structures of the brain were suboptimally visualized. Nevertheless, Hanson found that the report was within normal limits and so she initialed the report, which indicated that the report had been read and appropriate action had been taken.

{¶ 7} Hanson stated that she relied upon Dr. Dogra's expertise in interpreting the ultrasound. She admitted it was her responsibility to request further imaging if the report did not provide her with enough information to fulfill her duty to her patient. However, she also stated that Dr. Dogra did not recommend another ultrasound in his report, as other radiologists had done in the past when the ultrasound was technically difficult.

{¶ 8} Raffis stated that she probably communicated the results of the ultrasound to Coleman and probably told her that nothing abnormal was found. Hanson stated that she never told Coleman that some of the visualizations were suboptimal on the ultrasound. She could not recall whether she offered Coleman the option of having another ultrasound. According to Coleman, the results of the ultrasound were not communicated to her, nor was a second ultrasound recommended or performed. She did, however, undergo other tests to rule out other fetal defects and problems.

{¶ 9} On December 12, 2001, Coleman gave birth to her daughter, San'Tara. Hanson immediately noticed San'Tara's facial deformity and irregular breathing. Medical tests revealed that the baby had alobar holoprosencephaly, a genetic condition in which the brain does not develop properly and which usually results in death within a few months. San'Tara died on December 24.

{¶ 10} The genetic doctors told Coleman that most babies with the condition do not survive and usually abort themselves. Coleman stated that the doctors also told her that a proper ultrasound could have detected the condition, although nothing could have been done to prevent it or to medically correct it. When asked if he believed that the holoprosencephaly should have been diagnosed when the ultrasound was conducted in July 2001, Dr. Dogra stated that the exam was technically very challenging, "so if you cannot see, you cannot diagnose."

{¶ 11} Coleman testified in her deposition that, at the beginning of her pregnancy, she decided to have her baby, instead of an abortion. However, she stated that if she had learned that her baby would be born with severe health problems where death was imminent, then she would have terminated her

pregnancy because she would not want her baby to suffer. This conclusion was based upon witnessing her cousin raise a child with cerebral palsy.

{¶ 12} Coleman sought treatment for depression after the baby's death. She filed a medical negligence action on behalf of herself and San'Tara's estate against the appellees, alleging that the negligent testing denied her the option of terminating the pregnancy, obtaining counseling, and/or planning for the condition of the child. The trial court granted appellees' motions for summary judgment. Coleman appeals, raising one assignment of error.[1]

{¶ 13} In the sole assignment of error, Coleman argues that the trial court erred in granting summary judgment for appellees.

{¶ 14} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241; *Zemcik v. La Pine Truck Sales & Equip.* (1998), 124 Ohio App.3d 581, 585, 706 N.E.2d 860. The Ohio Supreme Court set forth the appropriate test in *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, as follows:

"Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 273–274."

{¶ 15} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138.

{¶ 16} The instant case presents a case of first impression before this court but the issues were decided by the Fourth Appellate District in *Flanagan v. Williams* (1993), 87 Ohio App.3d 768, 772, 623 N.E.2d 185, to wit:

"[W]hether parents of a child born with congenital defects have a cause of action against physicians who fail to diagnose and/or inform the parents of the

---

1. Coleman has abandoned her wrongful-death claim on appeal.

defect within the time period that they could choose to terminate the pregnancy * * * [and] whether the child born with the congenital defects has a cause of action against the physician."

{¶ 17} The *Flanagan* court held that parents have cause of action against physicians who fail to diagnose or inform, but the court declined to hold that a child born with defects can maintain a cause of action against the physician. We agree.

{¶ 18} The Ohio Supreme Court has identified various prenatal torts. Although these types of torts are commonly labeled "wrongful life," "wrongful pregnancy," and "wrongful birth," they are not governed by statutory law, unlike wrongful death actions. *Hester v. Dwivedi* (2000), 89 Ohio St.3d 575, 578, 733 N.E.2d 1161; R.C. 2125.01 et seq.

{¶ 19} An action for "wrongful pregnancy" refers to a suit brought by a parent for damages arising from the birth of a child subsequent to an improperly performed sterilization procedure. *Johnson v. Univ. Hosps. of Cleveland* (1989), 44 Ohio St.3d 49, 540 N.E.2d 1370. Actions for wrongful pregnancy have been recognized in Ohio. See *Bowman v. Davis* (1976), 48 Ohio St.2d 41, 2 O.O.3d 133, 356 N.E.2d 496; *Johnson,* supra; *Simmerer v. Dabbas* (2000), 89 Ohio St.3d 586, 733 N.E.2d 1169.

{¶ 20} In a "wrongful birth" action, the parents seek damages for the birth of an impaired child when the physician or health care provider failed to diagnose or discover a genetic defect through prenatal testing or counseling, in time for the parents to avoid or terminate a pregnancy. *Flanagan v. Williams,* supra, 87 Ohio App.3d at 772, 623 N.E.2d 185, citing *Johnson,* supra.

{¶ 21} A "wrongful life" action is brought by or on behalf of the child claiming damages due to a physician's negligence in a sterilization procedure. *Bowman v. Davis,* supra, 48 Ohio St.2d at 43, 2 O.O.3d 133, 356 N.E.2d 496. This term "has also been used to describe actions by a child corresponding to the parents' 'wrongful birth' cause of action." *Flanagan v. Williams,* supra, 87 Ohio App.3d at 772, 623 N.E.2d 185, citing *Harbeson v. Parke–Davis, Inc.* (1983), 98 Wash.2d 460, 656 P.2d 483.

{¶ 22} These prenatal torts have explicitly been classified as traditional negligence actions and are determined by application of common-law tort principles. *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc., Inc.,* 155 Ohio App.3d 640, 2003-Ohio-7150, 802 N.E.2d 723, at ¶ 21, citing *Bowman v. Davis,* supra, 48 Ohio St.2d at 45, 2 O.O.3d 133, 356 N.E.2d 496; *Hester v. Dwivedi,* supra, 89 Ohio St.3d at 578, 733 N.E.2d 1161. Thus, a plaintiff must prove the following elements: (1) a duty running from the medical professionals to the

plaintiff, (2) a breach of that duty, (3) damages suffered by the plaintiff, and (4) a proximate causal relationship between the breach of duty and the damages. *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc.*, supra, at ¶ 21, *Simmerer v. Dabbas*, supra, 89 Ohio St.3d at 588, 733 N.E.2d 1169; *Hester v. Dwivedi*, supra, 89 Ohio St.3d at 578, 733 N.E.2d 1161.

## Wrongful Life

{¶ 23} Coleman alleged on behalf of San'Tara's estate that, as a result of the appellees' conduct, San'Tara was born with severe alobar holoprosencephaly and incurred mental and physical pain and suffering. Although this claim is determined upon the elements of medical negligence, the Ohio Supreme Court has commonly referred to this action as one for "wrongful life." As a matter of public policy, the Ohio Supreme Court has rejected a claim for "wrongful life" because these claims force courts to weigh the value of being versus nonbeing. *Hester v. Dwivedi*, supra, 89 Ohio St.3d at 579, 733 N.E.2d 1161; *Bowman v. Davis*, supra, 48 Ohio St.2d at 45, 2 O.O.3d 133, 356 N.E.2d 496. The *Hester* court, in concluding that the plaintiff was unable to prove the prima facie elements of causation and damages to support her medical negligence claim, held that "the status of being alive simply does not constitute injury." Id., 89 Ohio St.3d at 580, 733 N.E.2d 1161. See, also, *Flanagan v. Williams*, supra, 87 Ohio App.3d at 776, 623 N.E.2d 185 ("In the absence of guidance from the Supreme Court or the General Assembly, we are not prepared to say that life, even with severe disabilities, constitutes an actionable injury").

{¶ 24} Based on the holdings of the Ohio Supreme Court, this court does not recognize an action for "wrongful life" brought on behalf of San'Tara. Therefore, the trial court did not err in granting summary judgment on the "wrongful life" claim brought by Coleman on behalf of San'Tara's estate.

## Wrongful Birth

{¶ 25} Coleman also alleged that the appellees failed to provide her with the information necessary for her to make an informed decision as to whether she should terminate her pregnancy. Neither the Ohio Supreme Court nor the General Assembly has decided whether an action for "wrongful birth" is recognized in Ohio. As the *Schirmer* court acknowledged, "[a]bsent guidance by the General Assembly, our effort is to 'ensure that the law keeps up with the ever-changing needs of a modern society.'" *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc.*, supra, at ¶ 22, citing *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 251, 617 N.E.2d 1052.

{¶ 26} We recognize that there is a split among the states as to whether an individual can recover under a "wrongful birth" claim. More than 20 states and

the District of Columbia have recognized a cause of action when parents are not informed of congenital defects in sufficient time to allow them to exercise their right to choose whether to terminate or prevent pregnancy either in a "wrongful birth" action or under a traditional common-law medical malpractice case. See *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc.,* supra; *Flanagan v. Williams,* supra; and *Bader v. Johnson* (Ind.2000), 732 N.E.2d 1212. However, at least eight states have judicially rejected these claims and at least five states have enacted legislation to prohibit recovery in a wrongful-birth negligence case. Id.

██ {¶ 27} Although there is a split among the states, several Ohio courts have recognized this prenatal tort. The appellate courts in the First and Fourth Districts found that a parent's wrongful-birth claim is a legitimate claim for relief. See *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc.,* supra; and *Flanagan v. Williams,* supra. While this court recognizes that *Flanagan* has been criticized by the Ohio Supreme Court in regard to the damages available for recovery, the court did not address the merits of *Flanagan.* In fact, the court stated:

"If appellees failed to provide [the mother] with the disconcerting test results, as alleged in the complaint, [the mother] can claim to be injured in that she was deprived of the choice to avoid those expenses by terminating the pregnancy. But that issue is not presented in this appeal." *Hester v. Dwivedi,* supra, 89 Ohio St.3d at 582, 733 N.E.2d 1161.

{¶ 28} Therefore, the Ohio Supreme Court has opened the door to recognize this type of injury. Thus, the 1993 holding of *Flanagan* is still good law, and we find it persuasive. Furthermore, the General Assembly has not acted in the 11 years since *Flanagan* to bar such a claim.

{¶ 29} The appellees argue that even if this court were to recognize an action for wrongful birth, summary judgment is still appropriate because Coleman is unable to prove the elements of a medical negligence claim, specifically causation and damages.

{¶ 30} In order for Coleman to prevail, she must prove that a duty was owed to her by the appellees, that the appellees breached that duty, that she suffered damages, and that a proximate causal relationship exists between the breach and her damages. In essence, she must prove that the injury complained of, the denial of her right to make an informed choice about terminating her pregnancy, was directly and proximately caused by a practice that a physician of ordinary skill, care, or diligence would not have done. *Flanagan v. Williams,* supra, 87 Ohio App.3d at 773, 623 N.E.2d 185, citing *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 548, 602 N.E.2d 423.

{¶ 31} The deposition testimony revealed that Dr. Dogra based his report regarding the baby's heart, head, brain, and face on suboptimal views. No optimal views of these features were obtained, yet another ultrasound was not recommended by Dr. Dogra or Hanson. The deposition testimony of Raffis and Hanson clearly provided that if the ultrasound results had been communicated to Coleman, they would have been within normal limits. Hanson, who read and reviewed the report, admitted that she had no education or training with ultrasounds and that she did not recommend a second ultrasound even after finding the report ambiguous.

{¶ 32} Coleman testified in her deposition that had she known that her child would have been born with a severe terminal illness, she would have terminated her pregnancy. Hanson stated that at the time of the ultrasound, Coleman would have still been able to legally terminate her pregnancy.

{¶ 33} Therefore, we find that Coleman has presented sufficient evidence demonstrating genuine issues of material fact as to whether the ultrasound was properly conducted, read, and interpreted, and whether the information contained in the ultrasound report was sufficiently conveyed to her to allow her to make an informed choice about her pregnancy or the need to seek counseling to prepare for the baby's condition. Thus, the court erred in granting summary judgment on Coleman's individual claim.

{¶ 34} Accordingly, we affirm in part as relates to the child's claim, and reverse in part and remand for further proceedings consistent with this opinion.

{¶ 35} This court finds there were reasonable grounds for this appeal. It is, therefore, considered that said appellants and appellees each pay one-half of the costs herein.

{¶ 36} It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

{¶ 37} A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Judgment accordingly.

PATRICIA ANN BLACKMON, P.J., and KENNETH A. ROCCO, J., concur.