Diane EMERSON et al.

v.

Henry MAGENDANTZ, M.D., et al.

No. 95–306–Appeal.

Supreme Court of Rhode Island.

Feb. 26, 1997.

Paul S. Cantor, Providence, for Plaintiffs.

R. Kelly Sheridan, Adam C. Robitaille, Providence, for Defendants.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on questions of law certified by a justice of the Superior Court in response to a motion to dismiss pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure filed by the defendant, Henry Magendantz, M.D., in opposition to a complaint of plaintiffs, Diane Emerson and Thomas F. Emerson (the Emersons or Diane), alleging negligence on the part of the defendant. The certified questions are as follows:

"1. Is there a cause of action under Rhode Island law when a physician negligently performs a sterilization procedure and the patient subsequently becomes pregnant and delivers a child from that pregnancy?

"2. If so, what is the measure of damages?"

The facts giving rise to these certified questions may be summarized as follows from the pleadings and the documents filed by the parties in the Superior Court and in this court. Following the birth of their first child, the Emersons decided for financial reasons to limit their family to one child. Having made this decision, Diane consulted defendant, who was a gynecological specialist, concerning sterilization procedures. The defendant agreed to perform a surgical tubal ligation and did so upon Diane on January 10, 1991. Subsequently, on or about May 31, 1991, Diane was seen by an obstetrician, who determined that she was pregnant in spite of the preceding tubal ligation. Diane gave birth to a child on January 11, 1992. The child, who was named Kirsten, is alleged to have congenital problems that are only generally described in the complaint. Following Kirsten's birth, Diane underwent a second tubal ligation.

In March 1994 the Emersons filed a complaint in the Superior Court for the County of Providence, alleging that Kirsten's birth was proximately caused by defendant's negligent performance of the tubal-ligation procedure. The complaint also alleged that defendant had failed properly to inform Diane and to obtain her consent prior to surgery.

The Emersons also allege that as a result of defendant's negligence Diane suffered severe physical pain and required additional invasive medical treatment. The Emersons further allege that they have suffered mental anguish and distress and that they have lost wages and earning capacity as a result of Diane's unanticipated pregnancy. The Emersons further complain that as a proximate result of defendant's negligence, they have incurred an obligation to expend monetary resources for the medical care and maintenance of Kirsten and that they will continue to be so obligated for many years to come.

## I

Is There a Cause of Action under Rhode Island Law When a Physician Negligently Performs a Sterilization Procedure and the Patient Subsequently Becomes Pregnant and Delivers a Child?

■ This question poses an issue of first impression in this state. Of the numerous courts that have considered this question, only one state court of last resort has declined to recognize a cause of action in tort arising out of the negligent performance of a sterilization procedure. *Szekeres v. Robinson,* 102 Nev. 93, 715 P.2d 1076 (1986). Even Nevada has suggested there may be an action for breach of warranty. *Id.* 715 P.2d at 1079.[1] All other jurisdictions that have considered this question have determined that the negligent performance of a sterilization procedure is a tort for which recovery would be allowed under state law. *See, e.g., University of Arizona Health Sciences Center v. Superior Court of Arizona,* 136 Ariz. 579, 667 P.2d 1294 (1983); *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984); *Burke v. Rivo,* 406 Mass. 764, 551 N.E.2d 1 (1990); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977); *Marciniak v. Lundborg,* 153 Wis.2d 59, 450 N.W.2d 243 (1990). In all, approximately thirty-five jurisdictions recognize a cause of action for negligent perfor-

mance of sterilization procedures whether performed on the wife or on the husband.

We are persuaded by the overwhelming majority of opinions that recognize negligent performance of a sterilization procedure as a tort for which recovery may be allowed. Therefore, we answer the first question in the affirmative.

## II

### What Is The Measure Of Damages?

Courts that have recognized the cause of action arising out of the negligent performance of sterilization or comparable procedures have adopted three general types of remedies as compensation for negligent procedures resulting in unwanted pregnancies. Thirty jurisdictions have adopted a remedy of limited recovery. *See Boone v. Mullendore,* 416 So.2d 718 (Ala.1982); *Wilbur v. Kerr,* 275 Ark. 239, 628 S.W.2d 568 (1982); *Coleman v. Garrison,* 349 A.2d 8 (Del.1975), *modified in part by Garrison v. Medical Center of Delaware, Inc.,* 581 A.2d 288 (Del. 1990); *Flowers v. District of Columbia,* 478 A.2d 1073 (D.C.App.1984); *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.Ct. App.1980); *Fulton–DeKalb Hospital Authority v. Graves,* 252 Ga. 441, 314 S.E.2d 653 (1984); *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *Garrison v. Foy,* 486 N.E.2d 5 (Ind.Ct.App.1985); *Nanke v. Napier,* 346 N.W.2d 520 (Iowa 1984); *Byrd v. Wesley Medical Center,* 237 Kan. 215, 699 P.2d 459 (1985); *Schork v. Huber,* 648 S.W.2d 861 (Ky.1983); *Pitre v. Opelousas General Hospital,* 530 So.2d 1151 (La.1988) (granting expenses of pregnancy and delivery, mother's pain and suffering, loss of consortium, and emotional distress for pregnancy resulting from failed sterilization, and intimating that proof of foreseeable risk of birth defects might result in greater damages); *Macomber v. Dillman,* 505 A.2d 810 (Me.1986); *Rinard v. Biczak,* 177 Mich.App.

---

**1.** In *Greco v. United States,* 111 Nev. 405, 893 P.2d 345 (1995), the Supreme Court of Nevada, in answering a certified question to the United States District Court for the District of Maryland, held that a mother might prosecute an action of medical malpractice against professionals who negligently failed to make a timely diagnosis of gross and disabling fetal defects, but further held that the child had no personal cause of action for "wrongful life."

287, 441 N.W.2d 441 (1989); *Girdley v. Coats,* 825 S.W.2d 295 (Mo. banc 1992); *Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003 (1982) (court referred to case as "wrongful birth" case, but child was healthy); *Hitzemann v. Adam,* 246 Neb. 201, 518 N.W.2d 102 (1994); *P. v. Portadin,* 179 N.J.Super. 465, 432 A.2d 556 (1981); *O'Toole v. Greenberg,* 64 N.Y.2d 427, 488 N.Y.S.2d 143, 477 N.E.2d 445 (1985); *Jackson v. Bumgardner,* 318 N.C. 172, 347 S.E.2d 743 (1986); *Johnson v. University Hospitals of Cleveland,* 44 Ohio St.3d 49, 540 N.E.2d 1370 (1989); *Morris v. Sanchez,* 746 P.2d 184 (Okl.1987); *Mason v. Western Pennsylvania Hospital,* 499 Pa. 484, 453 A.2d 974 (Pa.1982); *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987); *Crawford v. Kirk,* 929 S.W.2d 633 (Tex.App.1996); *C.S. v. Nielson,* 767 P.2d 504 (Utah 1988); *Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301 (1986); *McKernan v. Aasheim,* 102 Wash.2d 411, 687 P.2d 850 (1984) (en banc); *James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872 (1985); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982).

Under the limited-recovery rule the foregoing jurisdictions frequently grant compensation to the plaintiffs for the medical expenses of the ineffective sterilization procedure, for the medical and hospital costs of the pregnancy, for the expense of a subsequent sterilization procedure, for loss of wages, and sometimes for emotional distress arising out of the unwanted pregnancy and loss of consortium to the spouse arising out of the unwanted pregnancy. They also generally include medical expenses for prenatal care, delivery, and postnatal care.

A number of jurisdictions allow for recovery of the cost of child rearing as an element of damages. These jurisdictions may be divided into two groups. One group allows the cost of child rearing but balances against this cost the benefits derived by the parents, either economic or emotional, from having a healthy child. *See, e.g., University of Arizona Health Sciences Center v. Superior Court of Arizona,* 136 Ariz. 579, 667 P.2d 1294 (1983); *Ochs v. Borrelli,* 187 Conn. 253,

445 A.2d 883 (1982); *Burke v. Rivo,* 406 Mass. 764, 551 N.E.2d 1 (1990).

Two jurisdictions have adopted a full-recovery rule without offsetting either the economic or the emotional benefits to be derived from having a healthy child. *Lovelace Medical Center v. Mendez,* 111 N.M. 336, 805 P.2d 603 (1991); *Marciniak v. Lundborg,* 153 Wis.2d 59, 450 N.W.2d 243 (1990). These two courts apply traditional tort principles in allowing for recovery of all damages that are reasonably foreseeable and that would result from the negligent performance of the sterilization procedure. In analyzing § 920 of the Restatement (Second) *Torts* (1979), which recommends consideration of benefits conferred in mitigation of damages, the New Mexico Supreme Court concluded that applying emotional benefits to economic loss did not apply similar benefits to similar losses. *Lovelace,* 805 P.2d at 613–14. Consequently that court denied recovery for emotional distress and also denied any offset of emotional benefits derived from having a healthy child. *Id.*

Similarly the Supreme Court of Wisconsin declined to offset emotional benefits against economic loss. *Marciniak,* 450 N.W.2d at 249. The court also declined to offset economic benefits because the court deemed them to be insignificant. *Id.*

After considering with great care the opinions in support of limited recovery, of full recovery with benefit offsets, and of full recovery without benefit offsets, we have decided to adopt the limited-recovery rule as described above, save for the element of emotional distress arising out of an unwanted pregnancy that results in the birth of a healthy child.

The Supreme Court of Washington in *McKernan v. Aasheim, supra,* has made some pertinent comments:

"We believe that it is impossible to establish with reasonable certainty whether the birth of a particular healthy, normal child damaged its parents. Perhaps the costs of rearing and educating the child could be determined through use of actuarial tables or similar economic information. But whether these costs are outweighed by the

emotional benefits which will be conferred by that child cannot be calculated. The child may turn out to be loving, obedient and attentive, or hostile, unruly and callous. The child may grow up to be President of the United States, or to be an infamous criminal. In short, it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain." 687 P.2d at 855.

Similarly, the Delaware Supreme Court, in denying recovery of child-rearing costs, suggested that determining damage from the birth of a child was an "exercise in prophecy." *Coleman v. Garrison,* 349 A.2d 8, 12 (Del.1975). Such a weighing process might be applied at the end of a life but not at the beginning. Such an undertaking was not felt to be within the specialty of factfinders. *Id.* In *Rieck v. Medical Protective Co. of Fort Wayne, Indiana,* 64 Wis.2d 514, 219 N.W.2d 242 (1974), later superseded by *Marciniak v. Lundborg, supra,* the Supreme Court of Wisconsin, in a wrongful-birth case wherein pregnancy was diagnosed too late for an abortion to be performed, commented upon the alternative of adoption as follows:

> "To allow damages in a suit such as this would mean that the physician would have to pay for the fun, joy and affection which plaintiff * * * will have in the rearing and educating of this, defendant's fifth child. Many people would be willing to support this child were they given the right of custody and adoption, but according to plaintiff's statement, plaintiff does not want such. He wants to have the child and wants the doctor to support it. In our opinion to allow such damages would be against public policy." *Rieck,* 219 N.W.2d at 245 (quoting *Shaheen v. Knight,* 11 Pa.D. & C.2d 41 (1957)).

In *Johnson v. University Hospitals of Cleveland,* 44 Ohio St.3d 49, 540 N.E.2d 1370, 1377 (1989), the Supreme Court of Ohio, after considering rules adopted by the various states, suggested that it would not mechanically apply the rules of proximate cause and foreseeability. It suggested that proximate cause is merely the limitation that the courts have placed upon the actor's responsibility for the consequences of the actor's conduct.

*Id.* (citing Prosser & Keeton, *The Law of Torts,* § 41 at 264 (5th Ed.1984)). The court cited with approval the text that " 'the legal limitation of the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands.' " 540 N.E.2d at 1377. The court went on to reject the no-recovery rule, the offsetting-benefits rule, and the full-recovery rule. *Id.* at 1378. In rejecting the full-recovery rule, the court stated that the "strict rules of tort should not be applied to an action to which they are not suited, such as a wrongful pregnancy case, in which a doctor's tortious conduct permits to occur the birth of a child rather than the causing of an injury." *Id.* The court went on to state that the "limited-damages theory [was] the most persuasive rule." *Id.* In *Cockrum v. Baumgartner, supra,* the Supreme Court of Illinois also canvassed the field of decisional and textual law. It concluded by stating:

> "We cannot on balance accept the plaintiffs' contention too that we should rigidly and unemotionally, as they put it, apply the tort concept that a tortfeasor should be liable for all of the costs he has brought upon the plaintiffs. It has been perceptively observed, by distinguished authority [Justice Holmes], that the life of the law is not logic but experience. Reasonableness is an indispensable quality in the administration of justice. * * * The reasons given for denying so-called rearing costs are more convincing than the reasons for abstractly applying a rule not suited for the circumstances in this character of case." 69 Ill.Dec. at 173, 447 N.E.2d at 390.

We are of the opinion that the public policy of this state would preclude the granting of rearing costs for a healthy child whose parents have decided to forego the option of adoption and have decided to retain the child as their own with all the joys and benefits that are derived from parenthood. Their decision to forego the option of releasing the child for adoption constitutes most persuasive evidence that the parents consider the benefit of retaining the child to outweigh the economic costs of child rearing. *See Public Health Trust v. Brown,* 388 So.2d 1084, 1086 (Fla.Dist.Ct.App.1980), *pet. den.,* 399 So.2d

1140 (Fla.1981); *see also Fassoulas v. Ramey,* 450 So.2d 822 (Fla.1984).

In implementing the limited-benefit rule, such parents would be entitled to recover the costs that the overwhelming majority of jurisdictions have allowed. Under this rule, plaintiffs would be entitled to recover the medical expenses of the ineffective sterilization procedure, the medical and hospital costs of the pregnancy, the expense of a subsequent sterilization procedure, loss of wages, loss of consortium to the spouse arising out of the unwanted pregnancy, and medical expenses for prenatal care, delivery, and postnatal care. However, no recovery would be allowable for emotional distress arising out of the birth of a healthy child.

In the event of the birth of a child who suffers from congenital defects, which birth is a result of an unwanted pregnancy arising out of a negligently performed sterilization procedure, we would follow the reasoning of the Supreme Court of Florida. In *Fassoulas,* the prospective parents, having had two children both of whom had been born with severe congenital abnormalities, sought to prevent the birth of further children through a vasectomy performed upon the husband. 450 So.2d at 822. The vasectomy was unsuccessful, and two children were born, the second with a birth deformity that was corrected. *Id.* at 822–23. The court went on to deny child-rearing damages for a normal, healthy child, *id.* at 823–24, but observed that in the case of a physically or a mentally handicapped child, special medical and educational expenses beyond normal rearing costs should be allowed. *Id.* at 824. The court recognized that the " 'financial and emotional drain associated with raising such a child is often overwhelming to the affected parents.' " *Id.* Therefore, the court held that special costs associated with bringing up a handicapped child would be recoverable. We believe that the reasoning of the Florida court is sound but would add that when a physician is placed on notice, in performing a sterilization procedure, that the parents have a reasonable expectation of giving birth to a physically or a mentally handicapped child or if the physician should be placed on notice, by reason of statistical information of which he/she is or should be aware in the practice of his/her profession, then the entire cost of raising such a child would be within the ambit of recoverable damages. It should also be noted that the extraordinary costs of maintaining a handicapped child would not end when the child reached majority. Nor would the physician's liability necessarily end at that point. Offset against such liability would be any economic benefits derived by the parents from governmental or other agencies that might contribute to defraying the costs of caring for the child or its support in adult life. Also in the event of the birth of a physically—or a mentally—handicapped child, the parents should be entitled to compensation for emotional distress.

The foregoing determinations are made by this court in answer to the second certified question submitted by the Superior Court. The papers in the case may be remanded to the Superior Court for further proceedings.[2]

**2.** Our brothers in dissent suggest that the tort of a negligently performed sterilization procedure that results in the birth of a healthy child is a routine common law negligence case. Unfortunately, that suggestion though plausible will not withstand analysis. The issue of awarding damages for the birth of a healthy child was unknown to the common law. In answering the certified question on measure of damages, we have attempted to adopt a rule that is consonant with that chosen by thirty other jurisdictions. With all due respect to the constitutional suggestions raised in *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982), we believe that *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), have little if any relevance to our determining a measure of damages for a negligent act performed by a physician. The constitutional rights in respect to contraception and abortion recognized in the foregoing cases inhibit governmental agencies from interfering with the exercise of such rights. They do not purport to place a burden upon negligent physicians for the raising of a healthy child. Even Justice Douglas, who was the author of *Griswold v. Connecticut,* would have difficulty in considering the principles enunciated therein as a basis for a measure of damages for negligence.

The suggestion that our answer to the certified question creates a suspect classification is also unfounded. Our colleagues are aware that suspect classifications are those based upon race, alienage, or national origin. *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29

BOURCIER, J., with whom FLANDERS, J., joins, concurring in part and dissenting in part.

I concur with my colleagues' response to the first certified question that a cause of action exists when a physician negligently performs a sterilization procedure and the patient subsequently becomes pregnant and a child results from that pregnancy. I dissent, however, from their response to the second certified question regarding the measure of damages available to the unfortunate patient upon whom the doctor's negligence has been visited.

I believe that the true legal nature of the cause of action that we all recognize and acknowledge in this certification proceeding is nothing more and nothing less than a medical malpractice cause of action. As aptly noted in *Miller v. Johnson*, 231 Va. 177, 343 S.E.2d 301 (1986):

> "Under traditional tort principles, it is clear that a physician who performs an abortion or sterilization procedure owes a legal duty to the patient. Where the patient can establish failure to perform the procedure with reasonable care and damages proximately resulting from breach of the duty, she is entitled to recover as in any other medical malpractice action." [3] *Id.* 343 S.E.2d at 304.

Accordingly, I would use as a starting premise in determining what measure of damages should be permitted to a victim of medical malpractice negligence the same un-questioned basic common law rule of damages that we have applied in all negligence cases for centuries. We have always permitted the victim of a negligent tortfeasor to recover for all of the injuries and damages that can be proven to have been reasonably foreseeable and proximately caused by the tortfeasor's negligence. *Atlantic Tubing & Rubber Co. v. International Engraving Co.*, 528 F.2d 1272 (1st Cir.), *cert. denied,* 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976); *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827 (R.I.1986); *Prue v. Goodrich Oil Co.*, 49 R.I. 120, 140 A. 665 (1928). *See also* Restatement (Second) *Torts* § 917 (1979); 1 Minzer, Nates, Kimball, Axelrod and Goldstein, *Damages in Tort Actions,* chs. 1, 2 (1996); 4 Harper, James, and Gray, *The Law of Torts,* §§ 20.4, 20.5 at 130–39 (2d ed.1986).

Even though it appears that our recognition here of the plaintiff's cause of action, whether described as an action for "wrongful birth," "wrongful life," or "wrongful conception," [4] is relatively new,[5] the existence of the common law cause of action, trespass on the case, into which it relates and fits and from which it emanates, is centuries old, giving suitable credence to the adage "[t]he genius of the common law is its ability to create and adopt remedies for each new wrong as it occurs." 1 Lee & Lindahl, *Modern Tort Law* § 1.02 at 4 (rev. ed.1966). In the certified damages question presented to us, we have been requested by the Superior Court trial justice to promulgate the remedy available to

L.Ed.2d 534 (1971); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734, 736 (R.I.1992). At least until today, the Supreme Court of the United States has not applied strict judicial scrutiny to statutes (or court decisions) that formulate a rule of damages based upon relatively new causes of action. We believe that the constitutional gloss placed upon the selection of a rule of compensation is more ephemeral than real. We also believe that the citation of numerous cases relating to special procedural rules for malpractice actions including our opinion in *Boucher v. Sayeed,* 459 A.2d 87 (R.I.1983) are just not relevant to the determination of our answer to the second certified question in the case at bar.

**3.** *See also Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003, 1005 (1982); Brian McDonough,

Note, *Wrongful Birth: A Child of Tort Comes of Age,* 50 U. Cinn.L.Rev. 65 (1981); Note, *Sterilization and Family Planning: The Physician's Civil Liability,* 56 Geo. L.J. 976 (1968); Gerald B. Robertson, *"Civil Liability Arising From 'Wrongful Birth' Following An Unsuccessful Sterilization Operation,"* 4 Am.J.L. & Med., 131 (1978–79).

Medical negligence based malpractice causes of action have been recognized in Rhode Island since at least 1909. *Griffin v. Woodhead,* 30 R.I. 204, 74 A. 417 (1909).

**4.** For perhaps the clearest discussion of the three tort designations and what each concerns, see *Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301, 303–04 (1986).

**5.** The first reported judicial decision appears to have been *Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620 (1934).

a plaintiff in this state in a wrongful conception or wrongful pregnancy action.

I believe that the recovery-damage rule we formulate in response to that certification request should follow as closely as possible our centuries old rule for damages in negligence cases in order to preserve not only stability in the law, but consistency as well, in that rule of damages. It (1) should not discriminate in favor of one class of plaintiffs as against another in negligence malpractice cases, (2) should not discriminate and favor one particular class of medical specialist as against all other medical specialists in medical malpractice cases, (3) should respect and follow the constitutional right of women to decide if they do not want to give birth to a child or children as recognized in *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and (4) should ensure that the victim of a medical doctor's negligence will have full and fair "recourse to the laws, for all injuries or wrongs" proximately resulting from that negligence as guaranteed by article 1, section 5, of the Rhode Island Constitution.

I believe the damages rule we should adopt and promulgate for the victim of a physician's negligence in a wrongful conception or wrongful pregnancy negligence case is the rule adopted by the Supreme Judicial Court of Massachusetts in *Burke v. Rivo,* 406 Mass. 764, 551 N.E.2d 1 (1990), and by the Connecticut Supreme Court in *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982). That rule would satisfy all the foregoing considerations that I believe our damages rule should accommodate.

I acknowledge, as do my colleagues, that appellate courts throughout this country that have considered this damage question have been sharply divided with regard to what should be proper compensation for the victim of medical negligence malpractice in the course of a sterilization procedure.

Some courts, the minority, permit the victim of the physician's negligence to recover for all the damages proximately resulting from the physician's negligence, including emotional as well as predicted costs and expenses that will be incurred raising and providing for the unplanned-for child until that child reaches the age of maturity. Some courts deny any recovery for emotional damages or child rearing expenses. Still other courts permit recovery for emotional damages but not for child rearing, and one or possibly two courts deny all damages for the unplanned pregnancy, and birth, save for the recovery of the medical charges paid to the doctor who performed the negligent sterilization procedure and for the hospital expenses incurred in the delivery and the birth of the child. The most balanced and practical number of cases, however, follow the Massachusetts and Connecticut rule and the Restatement (Second) *Torts* § 920 (1979) which both permit full recovery for all damages proximately resulting from the physician's negligence while also permitting the trial jury to mitigate or reduce any damage award by what may be proven to be the value of the benefit that is conferred upon the plaintiff parent or parents by the birth of the child.

If one were to look for what might be deemed a common element running through most of the cases, it would be that most all agree that the parents of the unplanned-for child are at least entitled to recover the amounts paid by them for the medical charges paid to the negligent physician and for the medical costs and hospital expenses incurred by the mother for the unplanned birth, along with any loss of wages sustained by the mother during her pregnancy. In addition, most courts would also permit the mother to recover for the cost of any corrective sterilization procedure and would permit, in the case of a husband, the husband's right to recover for any loss of consortium sustained during his wife's unplanned pregnancy.

My review of the subject case holdings and the divergent views reflected therein convinces me that the certified question to which we are requested to respond in this case permits us the opportunity to learn from careful examination of the various viewpoints and to promulgate and declare a rule that will borrow only what is both good and reasonable from those earlier reported deci-

sions. Unlike my colleagues, I would not borrow from *McKernan v. Aasheim*, 102 Wash.2d 411, 687 P.2d 850 (1984). That court denies any recovery to the negligent physician's patient for emotional trauma or child-raising costs although all are certainly directly caused by the physician's tortious negligence. Its reasoning for doing so is simply stated as follows:

"In our view, however, its basic soundness lies in the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child * * * it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved. Speaking legally, this may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the 'unwanted' child for adoption." *Id.* 687 P.2d at 852 (quoting *Public Health Trust v. Brown*, 388 So.2d 1084, 1085–86 (Fla.Dist.Ct.App.1980)).

That "abort, give away, and get no emotional trauma and child support damages" rule announced by the Washington court, appears, in my opinion, to deny a woman's constitutional right not to have children recognized in *Eisenstadt, Griswold* and *Roe, supra*. If a medical doctor's negligence deprives any woman, unmarried or married, of that constitutional right, she ought to be entitled to recover, as do all other victims of medical malpractice, for all her proximately resulting damages and injuries, physical as well as emotional. I perceive of no justification for courts to force a Hobson's choice upon the unfortunate victim of a physician's negligence by ordering her to abort her unplanned pregnancy, or to give up her unplanned baby for adoption when born, or to accept in lieu of doing either, the judicially created concept that the "joy" of the unplanned birth will serve as full recompense for the doctor's negligence and for the victim's denial of her constitutional right to choose whether to become pregnant and give birth to a child. That "joy" reasoning concept is in my humble opinion nothing more than delusive reasoning employed to justify conclusion-oriented judicial decisions by certain appellate

courts. In addition, it either ignores or refuses to recognize what is considered to be one of life's basic human realities, namely, that any normal woman will be hard-pressed to abort her pregnancy or later to give away her unplanned-for baby for adoption without thereafter incurring some form of resulting emotional trauma.

I believe that my colleagues' response to the damages certification question serves effectively to foreclose automatically the right of any woman, whose constitutional right to choose whether to have a child or children has been violated and who, in addition, has been the victim of her physician's negligence in a medical sterilization procedure, to have a jury not only determine the existence of any alleged emotional trauma resulting from the physician's negligence, but, in addition, determine what, if any, damages caused by the negligent physician will result from caring for the unplanned-for child during that child's minority.

I find from a review of the pertinent subject matter cases that deny any recovery either for emotional trauma or for the costs and expenses for caring for the unplanned-for child during that child's minority what appears to be the common thread for the alleged legal justification for that denial. That common thread is the expressed fear that a trial jury is incapable of making any fair and proper award for those claims. That fear is based upon what appears to be preconceived opinion that any trial jury's award made to a negligent physician's patient would be based upon speculation. We should not fall prey to that fallacy and fear position. It simply overlooks the reality of what takes place in any courtroom in which jury trials are conducted. Damages for this type of medical malpractice should not be denied merely because they are speculative since they are no more so than the damages juries are regularly permitted to award every day in trial courts across this country for all other kinds of personal and emotional injuries. Can anyone seriously contend, or even reasonably suggest, that traditionally permitted and accepted trial evidence regarding pain and suffering, traumatic neurosis, actuarial table estimations and predictions re-

garding how long a person can be expected to live, predictions of how long a person can be expected to work, the future predictions of when an injured person will partially or completely recover from a serious illness or injury or when a person will die, or the estimations and predictions of lifetime earnings a person will earn and even be required to spend for personal subsistence during the course of his or her estimated lifetime are not really all matters of speculation? Trial juries are permitted, day in and day out, in courtrooms throughout this country to accept, to evaluate, and to rely upon those types of evidence, in arriving at just and proper verdicts.[6] In this jurisdiction, in particular, there is no reason for us to even concern ourselves with that run-away-speculative-jury-verdict fear. We have more than ample statutes, rules, and case law that provide positive judicial safeguards to remedy any such possible jury-award indiscretion.

It is elementary law in this jurisdiction that not only can a trial justice set aside a jury-verdict damage award that he or she believes to be excessive or so disproportionate to the proven injury and damages, but in addition to that initial built-in trial-court judicial safeguard, this Supreme Court retains final appellate authority to do likewise and has not been reluctant in the past to have done so. Accordingly, our presently existing judicial safeguards belie any reason for us to create or to fashion any judicial tort recovery "caps" or damage-recovery prohibitions founded upon the possible fear that a trial jury might award to the plaintiff-victim of a negligent medical tortfeasor more than he or she is entitled to recover. We should never lose sight of distinguishing in tort litigation between who has been wronged and damaged and who committed that wrong and caused the damage. Any equities should be resolved in favor of the innocent victim and not in favor of the negligent wrongdoer.

The reasoning advanced by my colleagues in support of insulating and absolving the negligent physician from all but minuscule responsibility for his or her patient's un-

planned-for-child costs and expenses is that "[w]e are of the opinion that the public policy of this state would preclude the granting of rearing costs for a healthy child whose parents have decided to forego the option of adoption and have decided to retain the child as their own with all the joys and benefits that are derived from parenthood."[7] I respectfully disagree with that assumed public policy view expressed by my colleagues. I agree instead with the view regarding damage recovery and public policy as expressed by the Connecticut Supreme Court in *Ochs, supra.*

> "In our view, the better rule is to allow parents to recover for the expense of rearing an unplanned child to majority when the child's birth results from negligent medical care. The defendants ask us to carve out an exception, grounded in public policy, to the normal duty of a tortfeasor to assume liability for all the damages that he has proximately caused. * * * But public policy cannot support an exception to tort liability when the impact of such an exception would impair the exercise of a constitutionally protected right. It is now clearly established that parents have a constitutionally protected interest located 'within the zone of privacy created by several fundamental constitutional guarantees' * * * to employ contraceptive techniques to limit the size of their family." 445 A.2d at 885.

I would additionally note that it also appears from the majority's response made to the certified damage-recovery question that my colleagues, intentionally or not, have effectively formulated a new and unique damages rule for a negligence-based tort that actually serves to create and establish not only suspect classifications that discriminate among victims of medical malpractice but also suspect classifications that discriminate among the medical doctors furnishing those medical services. For example, the medical doctor in the case scenario from which the present certification comes, and who special-

---

6. General Laws 1956 § 9–19–38 permits proof of life expectancy and admission of "The Vital Statistics of the United States (Life Tables)."

7. I note the omission of the mother's option of *abortion* that is also given by the Washington case law relied upon by the majority.

izes in obstetrics and gynecology and who negligently performs a tubal ligation or sterilization procedure, faces extremely limited tort responsibility to his or her victim patient. On the other hand, the medical doctor who negligently performs an appendectomy or a tonsillectomy faces full and total tort liability to his or her victim patient. Likewise, discrimination appears even among the victims of the negligent obstetric and gynecological medical practitioner. In one setting the plaintiff who has been victim of her doctor's negligence and who gives birth to a healthy child is entitled to extremely limited expense tort recovery against the negligent doctor. If a child, however, is born to another victim of that same medical-procedure negligence and is unfortunately physically impaired, that victim will be entitled to full tort recovery. How the damage-recovery-rule cap formulated by the majority would apply to the case and claim of a *male* who falls victim to a negligently performed sterilization procedure such as a vasectomy is difficult to perceive. If, for example, in regard to an unmarried male who for purposes of not impregnating a woman, undergoes a vasectomy and then, relying upon his doctor's competence, discovers to his dismay that the woman has become pregnant, the application of the majority's rule of damages would then present some very interesting questions as well as problems. The young man in that situation would find himself automatically responsible and obligated by mandate of law, for many thousands of dollars for child-rearing expenses for the child, even for children for whom he most probably would only be granted limited visitation rights, but not custody. The justification for that unfortunate and inequitable result, according to the majority's view, is that the birth of the unplanned baby would actually constitute a "joy" or a "blessing" to the unfortunate young man and would thus fully compensate him for all of his expenses and problems.

I respectfully suggest that the so-called unwanted pregnancy that my colleagues believe transforms itself into a total joy or blessing that then serves to absolve the negligent physician from practically all liability to his victim patient is indeed a total joy or blessing, but only for the errant physician and not for the unfortunate victim. The joy or blessing concept emerging from the unplanned birth perhaps superficially, at first blush, would appear reasonable in the case of the happily married couple yearning for a child or children. But that is not what is before us in this certification, and that is not the nature of any of the medical-malpractice claims that are usually made against the errant physician who negligently performs a sterilization procedure. The factual reality in the usual medical malpractice case that is brought not only by women but also by males against the errant physicians who have negligently performed sterilization procedures is that the plaintiffs in those cases have decided for various reasons, economic or otherwise, not to have children. In those case situations I do not believe that the joy or blessing concept should automatically apply and restrict the tort recovery allowable to the married couple who had elected not to have children or to limit their family size for health or economic reasons. Neither should it so apply to the detriment of the unmarried young male or female college student or the professional career man or woman, married or single, who did not want to have a child or did not have the time to care for a child without first giving up his or her college, business, or professional career. To adopt a simple joy or blessing rule and then have it apply automatically to all litigants in those fact situations for purposes of limiting, to the point of practically eliminating, the liability of a negligent physician is neither fair nor in compliance with the age-old general tort-recovery damages rule. The joy or blessing rule in those situations is in my humble opinion nothing more than a judicial mirage, invisible to most ordinary mortals.

If the General Assembly enacted legislation that provided for that same discriminatory classification and damage limitation, our case law clearly indicates that such legislation would have great difficulty surviving state constitutional muster.

In rejecting our State Legislature's Medical Malpractice Reform Act of 1976, Justice Kelleher, speaking for a unanimous court, said:

"Absent a crisis to justify the enactment of such legislation, we can ascertain no satisfactory reason for the separate and unequal treatment that it imposes on medical malpractice litigants. The statute constitutes special class legislation enacted solely for the benefit of specially defined defendant health-care providers. As the trial justices correctly noted, the preliminary-hearing requirement applies when a plaintiff sues on a claim that he or she has been injured by the negligence of a medical doctor or a hospital but does not apply to actions against certain other tortfeasors in the health-care field such as unincorporated dentists, nurses, and physical therapists. Perhaps more egregious is the fact that the statute treats medical malpractice plaintiffs differently from nonmedical tort plaintiffs as a whole. In the absence of an identifiable legitimate governmental interest, these class distinctions constitute a patent violation of one of the most fundamental tenets of equal protection, namely, that persons similarly situated shall be treated in a like manner." *Boucher v. Sayeed*, 459 A.2d 87, 93 (R.I.1983).

See also, e.g., *Boyd v. Bulala*, 647 F.Supp. 781 (W.D.Va.1986); *Wright v. Central Du-Page Hospital Association*, 63 Ill.2d 313, 347 N.E.2d 736 (1976); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978); *Jeanne v. Hawkes Hospital of Mt. Carmel*, 74 Ohio App.3d 246, 598 N.E.2d 1174 (1991); *Duren v. Suburban Community Hospital*, 24 Ohio Misc.2d 25, 495 N.E.2d 51 (1985); *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988); *Baptist Hospital of Southeast Texas, Inc. v. Baber*, 672 S.W.2d 296 (Tex.App.1984), *writ of error revoked*, 714 S.W.2d 310 (Tex.1986); *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989); *Hoem v. State*, 756 P.2d 780 (Wyo.1988).

I believe that if any tort-recovery limitation, which in reality is a damages-recovery cap, is to be fastened upon a common-law-tort cause of action for medical malpractice that we have recognized in this jurisdiction since 1905, that cap ought to be made to apply equally to all claims made pursuant to that particular cause of action and should originate in the General Assembly and not in this Court.[8] In 1976 the General Assembly did undertake to address itself to medical-malpractice negligence actions. P.L.1976, ch. 244. It did so, however, only in a very limited way, providing for a statute of limitations and discovery rule for those particular actions. It also permitted a defendant medical doctor or medical provider to avail himself or herself of a collateral source rule so as to possibly reduce the overall damage responsibility of the doctor or medical providers.[9] If the General Assembly had ever intended to limit a plaintiff's right to damages in a negligence based medical malpractice case, it would have certainly done so.

I believe that the tort damages recovery limitations "cap" imposed by my colleagues upon a medical malpractice claim originating from a negligently performed sterilization procedure, in particular, the one concerned in the litigation from which the present certified question emanates, is both unfair and unnecessary. I am hard-pressed to envision the necessity that the majority sees as reason for the liability "protection and special dispensation" rule it has formulated in order to assist and protect a medical tortfeasor who practices in a limited medical specialty. I believe in the old adage that liability breeds responsibility, and in medical malpractice litigation stemming from a physician's negligence, it has been and should be the rule that a victim of negligence ought to be compensated fully

---

**8.** The defendant's counsel also believes that "plaintiff's claim is a public policy consideration that should be left for the General Assembly." If the plaintiff in this case or future litigants elect to challenge the constitutionality of the recovery cap established by the majority, this Court will then be placed in the awkward position of passing upon its own innovated rule. *See, e.g.,* 1 Minzer, Nates, Kimball, Axelrod, and Goldstein,

*Damages in Tort Actions,* § 3.06[2], at 132–35, 138–40 (1996).

**9.** G.L.1956 § 9–1–14.1, and G.L.1956 § 9–19–34. Strikingly similar legislation concerning a discovery rule as well as a medical malpractice collateral source rule was found to be unconstitutional in *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 833–36 (1980).

by the negligent tortfeasor. Judicially created exceptions to that rule serve only to inject confusion into it and render it not only difficult for litigants to identify but also to rely upon.

I would respond to the certified question regarding the damages available in this jurisdiction to the plaintiff below, and to any who might unfortunately follow after falling victim to his or her physician's negligence, as did the appellate courts in our adjoining sister jurisdictions, Connecticut and Massachusetts. My reasoning for so doing is based upon the precise and eloquent words of Justice Wilkins, writing for the majority in *Burke v. Rivo*, 406 Mass. 764, 551 N.E.2d 1 (1990). In the course of his opinion he actually touched upon and analyzed all the available case law referred to and relied upon by my colleagues. I offer his views in support of my dissent.

"The judge below recognized that damages properly would include the cost of the unsuccessful sterilization procedure and costs directly flowing from the pregnancy: the wife's lost earning capacity; medical expenses of the delivery and care following the birth; the cost of care for the other children while the wife was incapacitated; the cost of the second sterilization procedure and any expenses flowing from that operation; and the husband's loss of consortium. We would add the wife's pain and suffering in connection with the pregnancy and birth and with the second sterilization procedure. We also see no reason why the plaintiffs should not recover for emotional distress they sustained as a result of the unwanted pregnancy. Emotional distress could be the probable consequence of a breach of the duty the defendant owed directly to the plaintiffs. See *Gallagher v. Duke Univ.*, 852 F.2d 773, 778–779 (4th Cir.1988); *Fassoulas v. Ramey*, 450 So.2d 822, 823 (Fla. 1984); *Smith v. Gore*, 728 S.W.2d 738, 751–752 (Tenn.1987); *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825, 831 (1982).

"The principal issue is whether the plaintiffs are entitled, if they establish liability, to the cost of raising their child. Under normal tort and contract principles, that cost is both a reasonably foreseeable and a natural and probable consequence of the wrongs that the plaintiffs allege. The question is whether there is any public policy consideration to which we should give effect to limit traditional tort and contract damages. We conclude that there is none as to parents who have elected sterilization for economic reasons.

"Many justifications often relied on for declining to allow recovery of the cost of rearing a healthy child born as a result of a physician's negligence are outstandingly unimpressive. See Note, Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant, 68 Va.L.Rev. 1311, 1315–1323 (1982). The judicial declaration that the joy and pride in raising a child always outweigh any economic loss the parents may suffer, thus precluding recovery for the cost of raising the child (see, e.g., *Boone v. Mullendore*, 416 So.2d 718, 722 [Ala. 1982]), simply lacks verisimilitude. The very fact that a person has sought medical intervention to prevent him or her from having a child demonstrates that, for that person, the benefits of parenthood did not outweigh the burdens, economic and otherwise, of having a child. The extensive use of contraception and sterilization and the performance of numerous abortions each year show that, in some instances, large numbers of people do not accept parenthood as a net positive circumstance. We agree with those courts that have rejected the theory that the birth of a child is for all parents at all times a net benefit. See *Hartke v. McKelway*, 707 F.2d 1544, 1551–1552 (D.C.Cir.), cert. denied, 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983) (construing District of Columbia law before *Flowers v. District of Columbia*, 478 A.2d 1073 [D.C.1984]); *University of Ariz. Health Sciences Center v. Superior Court*, 136 Ariz. 579, 583–584, 667 P.2d 1294 (1983); *Ochs v. Borrelli*, 187 Conn. 253, 259–260, 445 A.2d 883 (1982); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169, 175 (Minn.1977); *McKernan v. Aasheim*, 102 Wash.2d 411, 418, 687 P.2d 850 (1984). While we firmly reject a universal rule that the birth of an unexpected healthy child is

always a net benefit, we also firmly reject any suggestion that the availability of abortion or of adoption furnishes a basis for limited damages payable by a physician but for whose negligence the child would not have been conceived. See *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 586 n. 5, 667 P.2d 1294 (1983); *Jones v. Malinowski,* 299 Md. 257, 274, 473 A.2d 429 (1984); *Sherlock v. Stillwater Clinic, supra* at 176.

"We are also unimpressed with the reasoning that child-rearing expenses should not be allowed because some day the child could be adversely affected by learning that he or she was unwanted and that someone else had paid for the expense of rearing the child. See *Hartke v. McKelway, supra* at 1552 n. 8. Courts expressing concern about the effect on the child nevertheless allow the parents to recover certain direct expenses from the negligent physician without expressing concern about harm to the child when the child learns that he or she was unwanted. See, e.g., *Boone v. Mullendore,* 416 So.2d 718, 721–722 (Ala.1982); *Wilbur v. Kerr,* 275 Ark. 239, 244, 628 S.W.2d 568 (1982); *McKernan v. Aasheim,* 102 Wash.2d 411, 421, 687 P.2d 850 (1984). The once unwanted child's knowledge that someone other than the parents had been obliged to pay for the cost of rearing him or her may in fact alleviate the child's distress at the knowledge of having been once unwanted. See *Custodio v. Bauer,* 251 Cal.App.2d 303, 325, 59 Cal.Rptr. 463 (1967). In any event, it is for the parents, not the courts, to decide whether a lawsuit would adversely affect the child and should not be maintained. See *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 585, 667 P.2d 1294 (1983), and cases cited.

"We see no validity to the arguments, sometimes made, that the costs of child-rearing are too speculative or are unreasonably disproportionate to the doctor's negligence. See, e.g., *Schork v. Huber,* 648 S.W.2d 861, 863 (Ky.1983); *James G. v. Caserta* [175 W.Va. 406], 332 S.E.2d 872, 878 (W.Va.1985); *Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 519, 219 N.W.2d

242 (1974). The determination of the anticipated costs of child-rearing is no more complicated or fanciful than many calculations of future losses made every day in tort cases. If a physician is negligent in caring for a newborn child, damage calculations would be made concerning the newborn's earning capacity and expected medical expenses over an entire lifetime. The expenses of rearing a child are far more easily determined. If there is any justification for denying recovery of normal tort damages in a case of this character, it is not that the cost of rearing a child is incapable of reasonable calculation or is too great to impose on a negligent physician.

"A substantial number of jurisdictions have allowed recovery of the cost of rearing a normal child to adulthood, offset, however, by the benefits that the parents receive in having a normal, healthy child. See *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 584–585, 667 P.2d 1294 (1983); *Ochs v. Borrelli,* 187 Conn. 253, 259–260, 445 A.2d 883 (1982); *Jones v. Malinowski,* 299 Md. 257, 270–271, 473 A.2d 429 (1984); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175–176 (Minn.1977). See also *Hartke v. McKelway,* 707 F.2d 1544, 1552 (D.C.Cir. 1983) ('allowing the plaintiff to prove that raising a child constitutes damage is the course of greater justice'). Such a balancing by the trier of fact requires a comparison of the economic loss of child-rearing with the emotional gains of having a normal, healthy child (converted into a dollar value). These courts have thought the comparison appropriate under the general principle expressed in Restatement (Second) of Torts § 920 (1979). A few courts have thought that, because the benefit conferred did not affect the economic interest that was harmed, no mitigation of the cost of child-rearing should be recognized. See discussion in *Hartke v. McKelway, supra* at 1557–1558 n. 16.

"If the parent's desire to avoid the birth of a child was founded on eugenic reasons (avoidance of a feared genetic defect) or was founded on therapeutic reasons (concern for the mother's health) and if a

healthy normal baby is born, the justification for allowing recovery of the costs of rearing a normal child to maturity is far less than when, to conserve family resources, the parents sought unsuccessfully to avoid conceiving another child. See *University of Ariz. Health Sciences Center v. Superior Court*, 136 Ariz. 579, 585, 667 P.2d 1294 (1983) ('For example, where the parent sought sterilization in order to avoid the danger of genetic defect, the jury could easily find that the uneventful birth of a healthy, non-defective child was a blessing rather than a "damage" '); *Jones v. Malinowski*, 299 Md. 257, 270–271, 473 A.2d 429 (1984) ('the assessment of damages associated with the healthy child's birth, if any, should focus upon the specific interests of the parents that were *actually* impaired by the physician's negligence, i.e., was the sterilization sought for reasons that were (a) genetic—to prevent birth of a defective child, or (b) therapeutic—to prevent harm to the mother's health or (c) economic—to avoid the additional expense of raising a child') (emphasis in original). See also *Hartke v. McKelway, supra* at 1553–1555, and authorities cited (no recovery of expenses of raising normal child

where sterilization was sought solely because of fear of childbirth).

"We conclude that, in addition to the recoverable damages described earlier in this opinion, parents may recover the cost of rearing a normal, healthy but (at least initially) unwanted child if their reason for seeking sterilization was founded on economic or financial considerations. In such a situation, the trier of fact should offset against the cost of rearing the child the benefit, if any, the parents receive and will receive from having their child. We discern no reason founded on sound public policy to immunize a physician from having to pay for a reasonably foreseeable consequence of his negligence or from a natural and probable consequence of a breach of his guarantee, namely, the parents' expenses in rearing the child to adulthood." [10] *Burke*, 551 N.E.2d at 3–6.

With that, I rest my dissent.

---

**10.** Section 920 of Restatement (Second) *Torts* provides:

"When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."