DECISION
The defendants move to dismiss the plaintiffs' complaint pursuant to R. Civ. P. 12 (b)(6) for failure to state a claim for which relief may be granted. The plaintiffs are the parents and guardians ad litem of Max Schloss, an infant. The defendants are a hospital, where the parents went for genetic testing, and the physician who conducted the tests.
According to the allegations of the complaint, in April 1996, the parents were tested by the physician at the hospital in order to determine if either was a carrier of Tay-Sachs disease. The plaintiffs allege that the tests were negligently conducted and reported. One of the parents was erroneously reported not to be a carrier of the defective gene which causes the disease in offspring. The parents decided to continue the mother's pregnancy. On December 5, 1996, Max was born with Tay-Sachs disease.
The plaintiffs allege that, had the defendants not been negligent, they would have opted to terminate the pregnancy. They further allege that, as a proximate result of that negligence, they have been needlessly burdened with raising a child with an invariably fatal, incurable neurological disease. They will be caused to suffer the emotional distress of watching their child die a gruesome death. They further allege that Max will lead a severely diminished childhood and will die by the age of five years, after a complete breakdown of his neurological and other systems.
All parties characterize the respective claims as one of wrongful birth and the other of wrongful life.
The parents urge that their claims for wrongful birth are logical extensions of the holding in Emerson v. Magendantz,689 A.2d 409 (R.I. 1997), which they characterize as addressing what they call "the wrongful pregnancy variation of wrongful birth." The defendants, understandably, consider Emerson as "a wrongful pregnancy case," asserting that the decision has no precedential value. They treat Emerson as if all that was before the Supreme Court in that case was the mother's claim for damages for her pre- and post-natal and delivery expenses, her pain and suffering incidental to her pregnancy and delivery, her loss of income, any expense of her corrective medical treatment, and loss of consortium. In other words, the defendants view Emerson as being a claim by the parents for damages to the parents because the physician's negligence was a proximate cause of an unwanted pregnancy.
The plaintiffs in Emerson, however, did seek damages for giving birth to the unwanted child. Birth is generally regarded as not being part of pregnancy, but rather its end. Further, they sought damages for raising the child born as a consequence of the defendant's negligence. They were held to be entitled to such damages, if the physician's negligence was the proximate cause of the birth of a living, but unhealthy, child. See, Emerson, 689 A.2d, at 414. The damages, albeit limited, in Emerson were imposed for the wrongfulness of the defendants' conduct which resulted in a pregnancy and birth, both of which can be characterized as the wrongful consequences of a defendant's negligence.
Both the majority and the dissent in Emerson shaped their responses to the first certified question to the language of the question. They were asked whether there was a cause of action when a physician negligently performed a sterilization procedure and the patient subsequently becomes pregnant and delivers a child. The majority answered yes because approximately thirty-five other jurisdictions recognize the cause of action. It is not clear whether the Court accepted all of the rationales expressed by the courts in those other jurisdictions, like New Hampshire, Massachusetts, New York, or Nevada, for example, all of which allowed claims for "wrongful pregnancy" as a form of claim for "wrongful birth." If the basis for decision in Emerson was a simple recognition by the overwhelming majority of jurisdictions of the claim, that same majority also recognizes a claim for negligent medical care resulting in an unwanted pregnancy andbirth of a damaged child.
The tiny minority of jurisdictions which deny relief for the claim avoid the point that, if no relief is granted for persons who sustain recognizable injury from the negligence of the genetic testers, the public can have no legal assurance of caution by the testers. The victims of shoddy, careless handling of the test procedures will have no legal recourse. They might as well not undergo the tests. The only limit on the testers' conduct would be a claim in fraud to protect patients from outright deceit, but even then the damages might be limited to a return of the charges by the tester. No good reasons are suggested in the minority holdings for not holding genetic testers to the same standards of care as all other medical testers. As the New Jersey Supreme Court pointed out nearly twenty years ago:
 ". . . The Supreme Court's ruling in Roe v. Wade, supra, clearly establishes that a woman possesses a constitutional right to decide whether her fetus should be aborted, at least during the first trimester of pregnancy. Public policy now supports, rather than militates against, the proposition that she not be impermissibly denied a meaningful opportunity to make that decision.
 As in all other cases of tortious injury, a physician whose negligence has deprived a mother of this opportunity should be required to make amends for the damage which he has proximately caused. Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects. (Citations omitted)." Berman v. Allan, 80 N.J. 421, 431-32, 404 A.2d 8, 14 (1979).
The Supreme Court of North Carolina has declined to allow the claim of parents of a congenitally infirm child for damages against a physician who negligently has deprived the parent of the choice to abort the child. The Court declined to apply traditional negligence analysis, among other reasons, because it could not find any injury to have been proximately caused by the physician's assumed negligence.
 "We again assume arguendo that the defendants owed the plaintiffs a duty and that they breached that duty. The issue of whether the breach of duty was the proximate cause of the `injury' to the plaintiff parents is more problematic, since even the plaintiffs acknowledge that the fetus which was to be Michael Azzolino was in existence and already genetically defective at the time the defendants first came into contact with the plaintiffs. We also assume arguendo, however, that the birth of Michael Azzolino was the proximate result of the defendants' negligence.
 Courts which purport to analyze wrongful birth claims in terms of `traditional' tort analysis are able to proceed to this point but no further before their `traditional' analysis leaves all tradition behind or begins to break down. In order to allow recovery such courts must then take a step into entirely untraditional analysis by holding that the existence of a human life can constitute an injury cognizable at law. Far from being `traditional' tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury." Azzolino v. Dingfielder, 315 N.C. 103, 111, 337 S.E.2d 528, 533-34 (1985).
But, our Supreme Court has held that Kirsten Emerson's life, with severe defects, is a legal injury for which her parents may be compensated, if Dr. Magendantz negligently performed a sterilization on her mother. Further, it is difficult to understand just what can the law do about the negligence of the defendants in Azzolino, supra. If there are no legal consequences for slipshod, even misleading, genetic counseling, what legal duty is there for counselors to meet any standard of professional care? Because there is a substantial portion of society which opposes abortion as a legitimate option in response to the prospect of delivering a child with genetic defects, the common law doctrine of negligence ought not to be scuttled by common law courts. Leaving the question to the legislative process, as required by Azzolino, supra, means that no resolution can be had while the abortion controversy remains politically viable.
Occasionally, as in Missouri, a court will disavow a claim for wrongful birth damages to a parent for reasons having little to do with the merits of the claim at common law. The Missouri Supreme Court recognized that a majority of the jurisdictions confronting the question have recognized the claim. Wilson v.Kuenzi, 751 S.W.2d 741 (Mo. 1988). Nevertheless, the Missouri Court went on to hold:
 "A reading of all of the cases persuades us that the real underlying problem in these cases stems from the fact that the courts have either closed their eyes to traditional tort causation, or have leaped over causation. Most courts have tried to cover the leap over causation by blending some causation language into their discussion of damages or into their discussions of public policy considerations." 751 S.W.2d at 743.
A careful reading of Wilson, supra, however, discloses that the Court had to confront the constitutionality of a statute which prohibited an award of damages on a claim that, but for the negligent conduct of another, he or she, or a child would have been aborted. The Court held that the statute did not apply retrospectively to the claims of the plaintiffs before it, and so, it didn't need to decide the constitutional question. It seems pretty clear that the Court did not relish consideration of the impact of the statute on the constitutional right to abortion.
Make no mistake. These cases are not about birth, or wrongfulness, or negligence, or common law. They are about abortion. For those who can accept that abortion is a legal choice for pregnant parents at pertinent times, there is no difficulty in finding room in the common law tort of negligence for claims of wrongful birth. For those who cannot accept that premise, no one should ever be compensated for injury just because the choice of abortion has been thwarted. For them, the tort of negligence will not fit for whatever reasons come to hand, whether it be lack of injury to a foreseeable plaintiff, or lack of proximate cause, or the novelty of the claim.
A holding that Rhode Island common law permits a damage claim for a negligently caused birth of an unhealthy child is not the creation of a new or novel remedy, best left to the General Assembly. Such a holding merely extends the holding in Emerson to cases reasonably grounded in the same rationale which supports the result in that case. Although ultimately, of course, only the Supreme Court can say how far-reaching or narrow its holding may be, trial courts have an obligation to litigants to apply the common law as derived from the opinions of the Supreme Court to cases before them. See, Richardson v. Bevilacqua, 115 R.I. 49, 52 (1975) (Trial justice should not certify question unless he or she feels unable to resolve it satisfactorily). Neither party here has moved here to certify any question. This Court has an obligation to decide the issue, even if it is called on to predict that the Supreme Court will declare the common law to permit a claim for wrongful birth beyond wrongful pregnancy alone.
The defendants' motion to dismiss the parents' claim for wrongful birth will be denied.
The child's claim for damages, characterized as a wrongful life claim, has a different frame of reference from his parents' claim. Assuming that the defendants were negligent in failing to diagnose the genetic risk to which he was exposed, the only way in which his injury could have been prevented would have been a timely abortion decision by his female parent. But the choice whether or not to conceive him, and to carry him as a fetus to his birth, was never his. He would have had no claim against anyone, if his parents had knowingly decided to allow him to be born in spite of a genetic certainty that he would be afflicted with his dreadful disease.
The moral implications of allowing the child's claim are philosophically staggering: What moral obligation does one person (the physician) have to another (the child) to have prevented the child's suffering by preventing the child from living? Should any person knowingly or negligently shorten even the most miserable life by so much as a moment?
By far, the majority of jurisdictions considering the question have denied liability in claims like that of the plaintiff child in this case.
Note, however, ought to be taken of the few jurisdictions which have allowed such claims.
In Turpin v. Sortino, 31 Cal.3d 220, 643 P.2d 954, 182 Cal. Rptr. 337 (1982) a child born totally deaf as a result of hereditary defects was denied general damages but was allowed to seek extraordinary damages to treat her hereditary ailment. As to general damages for a wrongful life claim, the Court held:
 "In requesting general damages in a wrongful life case, the plaintiff seeks monetary compensation for the pain and suffering he or she will endure because of his or her hereditary affliction. Under section 920's [of the Restatement Second of Torts] benefit doctrine, however, such damages must be offset by the benefits incidentally conferred by the defendant's conduct `to the interest of the plaintiff that was harmed.'
 With respect to general damages, the harmed interest is the child's general physical, emotional and psychological well-being, and in considering the benefit to this interest which defendant's negligence has conferred, it must be recognized that as an incident of defendant's negligence the plaintiff has in fact obtained a physical existence with the capacity both to receive and give love and pleasure as well as to experience pain and suffering. Because of the incalculable nature of both elements of this harm-benefit equation, we believe that a reasoned, nonarbitrary award of general damage is simply not obtainable." 31 Cal. 3d, at 236-37, 643 P.2d, at 964, 182 Cal.Rptr., at 347.
The California Court did, nonetheless, permit recovery for the extraordinary expenses of treatment during the child's lifetime, because it would be inconsistent to allow the parents to recover these expenses during the child's minority, but to deny them to the child for the rest of the child's life.
Since the plaintiff child in this case seeks general damages, and, because of his short life expectancy, he has no interest in extraordinary expenses during an anticipated majority, Turpin,supra, is no authority for recognizing his claim. Furthermore, should the child's disability persist beyond his attaining majority, Emerson, supra, suggests that damages to compensate for that disability may be recoverable in his parents' claim.Emerson, supra, 689 A.2d, at 77.
In Harbeson v. Parke-Davis, Inc., 98 Wn.2d 460,656 P.2d 483 (1983) the Court followed the California rationale in Turpin.
In that case, the minor plaintiffs suffered from "fetal hydantoin syndrome," which caused them to suffer from birth defects which included mild to moderate growth deficiencies, mild to moderate developmental retardation, and certain facial and bodily disfigurements. The plaintiffs claimed wrongful life damages. In agreeing with the California Court, the Court said:
 "The court acknowledges that `it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care.' We agree. The child's need for medical care and other special costs attributable to his defect will not miraculously disappear when the child attains his majority. In many cases, the burden of those expenses will fall on the child's parents or the state. Rather than allowing this to occur by refusing to recognize the cause of action, we prefer to place the burden of those costs on the party whose negligence was in fact a proximate cause of the child's continuing need for such special medical care and training." 98 Wn. 2d, at 479, 656 P.2d, at 495.
There is no allegation in this case that the child will require any medical expense for which his parents cannot be compensated. That case, too, is not any authority for his claim.
Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984) is a paradigm of hard cases making bad law. The infant plaintiff was born with congenital rubella syndrome, which involved multiple birth defects. The parents' claim for damages was barred by the statute of limitations. The Court disallowed any claim by the child of damages for pain and suffering and for a "diminished childhood" as presenting "insurmountable problems." The Court did allow the child to claim damages for the cost of extraordinary medical expenses which would have been otherwise recoverable by his parents. The Court eloquently declared:
 "Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become a instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the inherent injustice of that result. The right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the `wholly fortuitous circumstance of whether the parents are available to sue.' (Citing Turpin)." 97 N.J., at 351-52, 478 A.2d, at 762.
For the same reasons that neither the California nor the Washington case is persuasive here, Procanik also is not. If the negligence of the defendants in this case was the cause of injury to the child plaintiff, which resulted in extraordinary medical expense, his parents will be able to claim such damages.
The motion to dismiss the claim of the child through his parents and guardians ad litem will be granted.
The parties will settle a form of order for entry on notice.